(No. 32330.—

SCRIPTURE PRESS FOUNDATION, Appellee, *vs.* FRANK ANNUNZIO, Director of Labor, *et al.,* Appellants.

*Opinion filed March 23, 1953.*

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, of counsel,) for appellants.

CAMPBELL, CLITHERO & FISCHER, of Chicago, (J. MILTON GUY, and CARLTON L. FISCHER, of counsel,) for appellee.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

The Director of Labor and Commissioner of Unemployment Compensation of the State of Illinois appeal directly to this court from an order of the circuit court of Cook County reversing a decision of the Director of Labor in which the Director held that the appellee was not exempt under the provisions of section 2(f)(6)(G) of the Unemployment Compensation Act, as amended. (Ill. Rev. Stat. 1949, chap. 48, par. 218.) The action was brought in the circuit court of Cook County by appellee under the Administrative Review Act, (Ill. Rev. Stat. 1951, chap. 110, pars. 264-279,) pursuant to the judicial review provisions of section 25(a)(2) of the Unemployment Compensation Act. Ill. Rev. Stat. 1949, chap. 48, par. 242(a).

The appeal is properly taken directly to this court in accordance with the provisions of the last cited section of the Unemployment Compensation Act.

Appellee filed its claim for credit or refund with the Director of Labor in connection with unemployment compensation contributions allegedly erroneously paid by it covering the period June 1, 1945, to December 31, 1945, contending that it was exempt from coverage under section 2(f)(6)(G) of the Unemployment Compensation Act because it was organized and operated for religious purposes, that no part of its net earnings inured to the benefit of any private shareholder or individual, and that no substantial part of its activities consisted·of carrying on propaganda or otherwise attempting to influence legislation. The Director of Labor denied such claim, and in addition determined that the appellee was an employer subject to the act during the year 1946 and the first three quarters of 1947, and assessed it in the amount of $2321.29 for such period. Appellee followed the prescribed procedure in filing protest, hearings were held on the question, a Director's representative report was made, to which objections were duly filed, and the Director of Labor finally overruled the objections of appellee and adopted his representative's recommendations.

Section 2(f)(6) of the Unemployment Compensation Act provides as follows: "The term 'employment' shall not include * * * (G) Service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda or otherwise attempting to influence legislation."

The Scripture Press Foundation is an Illinois not-for-profit corporation which was organized on May 5, 1945, and commenced operations on June 1 of the same year. The purposes for which the foundation was organized, as stated in its articles of incorporation, are: "The dissemination of the Gospel, the distribution of the Scriptures, of extracts therefrom, of devotional and other literature relating thereto, and of helps and supplies for use in Christian activities. The organization and support of organizations, institutions and movements exclusively devoted to Christian missionary, educational and other evangelical efforts. In connection with the foregoing to engage in: 1. The production, purchase, circulation, distribution and sale of Christian literature, including books, periodicals, pamphlets, tracts, placards, mottos and supplies; and 2. The conduct of publication and printing establishments."

The incorporators, first board of directors, and sole members of the foundation during the period in question were Victor E. Cory, Bernice T. Cory, his wife, and Harry G. Saulnier, a brother-in-law of Mrs. Cory.

Victor E. Cory, organizer of appellee and its president, throughout his lifetime had participated in Sunday School and other organized religious activities, including the publication of religious song books and other religious books. Believing that Christian workers, particularly in Sunday schools, were not utilizing the most modern techniques in educational teaching, in 1932 Cory entered the religious publishing field by organizing a profit corporation, and business was commenced under name of Scripture Press, Inc. In 1945, Cory and his wife, as owners of the stock of Scripture Press, Inc., told their attorney that the work of the profit corporation was a missionary work, that its success was not of themselves or for themselves but of the Lord, that they felt that this work was not their personal property even though formally so organized, and that they wanted to make the Scripture Press a permanent Christian

work by donating it to a foundation. Upon their attorney's recommendation and advice they created the Scripture Press Foundation, (appellee,) and donated to it all of their stock in Scripture Press, Inc. Such stock had a net worth of about $30,000 when it was given to the foundation. Scripture Press, Inc., was thereafter dissolved and its assets distributed to Scripture Press Foundation, a non-profit corporation.

Appellee devotes itself primarily to the publication and distribution of religious literature, Sunday school supplies and miscellaneous merchandise used by Sunday schools and churches, such as religious novels, Bibles, wallets, pencils, chalk, greeting cards, etc. Its major publications are The All Bible Graded Series of Sunday School Lessons, The All Bible Vacation Series, a Nursery Series for Pre-School Children, and weekly papers for various aged children. Appellee also published *Sunday,* a magazine inherited from its predecessor, until November, 1945, when a new profit corporation named Sunday Magazine Inc. was organized and took over the publication of such magazine. During its operation by appellee, such magazine had incurred a continuous deficit.

Appellee also renders advisory educational services to pastors, church officers, and teachers with respect to Sunday school work and has a brochure explaining the steps in perfecting local Sunday school organizations.

While anyone may purchase materials from the appellee, the promotional literature advertising such products hardly ever reaches individuals unconnected with churches or Sunday schools and practically all of its sales are made to such institutions. Its gross sales of incidental supplies, such as pencils, chalk, greeting cards, etc., amounted to less than four per cent of its total sales. Some of appellee's materials were given away to missionaries. However, appellee does not have missionaries and does not conduct a Bible school or Sunday school itself.

On May 31, 1946, appellee's total assets were $219,-324.19, with a capital of $30,710.11 and a surplus of $2806.07. On October 31, 1947, appellee's total assets were $290,833.27, with a capital of $30,000, an earned surplus of $153,220.96, plus a profit for the quarter ending October 31, 1947, of $11,320.58. Gross sales for the nine months ending October 31, 1947, were $775,052.48, and it was anticipated that the 1947 gross sales would exceed $1,000,000.

At the time of the creation of the appellee, its president, Victor E. Cory, was receiving a $10,000 annual salary, and his wife, Mrs. Cory, as vice-president, was receiving a salary of $6000. As of October 31, 1947, their annual salaries were $15,000 and $10,000, respectively.

In 1947 almost one hundred and fifty workers were on appellee's payroll. In June of that year the Scripture Press Foundation established a pension plan for all of its employees, which was approved by the Commissioner of Internal Revenue as an exempt trust. The current yearly cost of such plan to the foundation was approximately $10,000. In addition, free sickness and accident insurance, Blue Cross hospital insurance, and group life insurance for the employees was paid entirely by the foundation. During the period in question the pay scale of all employees was raised considerably. Under the pension plan as established, based upon the then current salaries, Cory would ultimately be eligible to receive a monthly pension of $262.50 per month and a maximum of $26,000 life insurance. His wife, at the same time, would ultimately become eligible for a monthly pension of $194.26 and a maximum of $19,000 life insurance. Proportionately, other employees would be entitled to monthly pensions and life insurance in proportion to their salaries and service.

The bylaws of appellee, after stating the purposes of the corporation in the language of the articles of incorporation, prohibited the diversion of assets in the following

language: "In no case shall the corporation distribute to its members, directors, or officers any of its income or any of its property; provided however, that it may pay to any members, officers, or directors who shall render it services reasonable compensation for services actually rendered. No funds of the corporation shall be loaned to any member, officer or director." The bylaws also contain the usual articles as to membership, board of directors, officers and executives, and an executive advisory committee. The initial members of the corporation were the incorporators, namely, Victor E. Cory, Bernice Cory, and Harry G. Saulnier, and additional members could be admitted only on two-thirds vote of the members. Once a person was admitted to membership his membership continued until death, disability or resignation. The bylaws also provided for their amendment at any meeting of the board of directors by the affirmative vote of a majority and quorum of the board, a majority of the board constituting a quorum.

The uncontradicted testimony in the case is to the effect that none of the officers and other employees of appellee were at any time paid more than a reasonable compensation for their personal services.

Shortly after its incorporation, appellee filed an exemption affidavit with the Bureau of Internal Revenue in which it stated that it was an outgrowth or continuation of Scripture Press Inc. (a profit corporation), which was in existence since 1932. No action was taken by the Federal government in connection with this exemption affidavit because the organization had not been in existence for a sufficient period of time. After a year of operation, appellee submitted a new exemption affidavit in essentially the same form. In a letter dated September 11, 1946, the Deputy Commissioner of the Treasury Department of the United States notified appellee that, based upon the affidavit and supporting documents, it was exempt from Federal income tax under the provisions of section 101(6) of the Internal

Revenue Code and corresponding provisions of prior revenue acts, and also exempt under the provisions of sections 1426 and 1607 of the Code or corresponding provisions of the Social Security act.

On October 31, 1946, appellee made application to the Director of Labor for exemption under the Illinois Unemployment Compensation Act. While that application was pending, the Division of Unemployment Compensation in Illinois on January 7, 1947, mailed to appellee notice of a deputy's finding that one M. P. Heying, a former employee, had filed claim for unemployment compensation benefits, that the deputy director had made a finding to the effect that for the year ending December 31, 1945, the appellee was an "employer" liable for payment of unemployment compensation contributions; that claimant rendered services for appellee; and that claimant was paid $24 in wages in a certain calendar quarter of the year 1945. Such notice informed appellee that if it believed the finding to be incorrect it was to file an appeal within nine days from the date of finding, and, if no appeal were filed, the finding of such deputy would be final and uncontrovertable in any further proceedings. The notice did not come to the attention of any officer within the limited time, and no appeal was consequently filed. The claimant was a female part-time worker earning one dollar an hour, who had worked three days for the foundation in June of 1945, leaving the foundation's employ after three days of work. No hearing was conducted on the Heying claim or on the exemption status of the Scripture Press Foundation prior to the issuance of such notice, and it had not been notified of any hearing.

The trial court reversed the decision of the Director and held that the appellee, Scripture Press Foundation, was exempt from the payment of contributions under the Unemployment Compensation Act as a foundation organized and operated exclusively for religious purposes, no

part of the net earnings of which inured to the benefit of any private shareholder or individual.

The Director of Labor urges four errors of the trial court for reversal of its decision, as follows: First, that the trial court erred in holding that Scripture Press Foundation was organized and operated exclusively for religious purposes and that no part of its net earnings inured to the benefit of any private shareholder or individual; Second, in failing to hold that Scripture Press Foundation was an "employer" under the provisions of the Unemployment Compensation Act with respect to the year 1945, because appellee permitted a finding of a deputy, holding that it was an employer subject to the act during such time, to become final; Third, in failing to hold that the record returned by the Director of Labor was sufficient to sustain the decision of the Director denying the claim for refund and modifying the determination and assessment; and, Fourth, in sustaining the complaint filed by appellee under the Administrative Review Act.

The principal issue for decision by this court is whether or not Scripture Press Foundation is a foundation organized and operated exclusively for religious purposes, no part of the net earnings of which inure to the benefit of any private shareholder or individual.

It is well established by previous decisions of this court that in cases such as this the burden is upon the party claiming exemption to prove that it has satisfied the exemption requirements set forth in section 2(f)(6)(G) of the Unemployment Compensation Act. (*American Medical Assn.* v. *Board of Review,* 392 Ill. 614; *Zehender & Factor, Inc.* v. *Murphy,* 386 Ill. 258; *Zelney* v. *Murphy,* 387 Ill. 492.) The application of this rule to unemployment compensation cases is in keeping with the rule applied by this court in its determination of cases concerning exemption of property from general taxation laws, in which we have consistently held that such statutes must be strictly con-

strued and all debatable questions resolved in favor of taxation. (*People ex rel. Fix* v. *Trustees of Northwestern College*, 322 Ill. 120; *People ex rel. Baldwin* v. *Withers Home*, 312 Ill. 136; *First Congregational Church* v. *Board of Review*, 254 Ill. 220; *People ex rel. McCullough* v. *Bennett Medical College*, 248 Ill. 608.) In these exemption cases we have consistently followed the premise that courts have no right to make exemptions by judicial construction and one claiming that his property is exempt under a statute is required to show clearly that it is exempt within the provisions of the constitution and the statute. *People* v. *Northwestern College*, 322 Ill. 120; *People* v. *Withers Home*, 312 Ill. 136; *Knox College* v. *Board of Review*, 308 Ill. 160; *People ex rel. McCullough* v. *Deutsche Gemeinde*, 249 Ill. 132; *Catholic Knights* v. *Board of Review*, 198 Ill. 441; *Bloomington Cemetery Assn.* v. *People ex rel. Baldridge*, 170 Ill. 377; *People ex rel. Breymeyer* v. *Watseka Camp Meeting Assn.* 160 Ill. 576.

In previous decisions concerning the Unemployment Compensation Act this court has held that such statute is an exercise of the police power of the State for the public purpose of relieving unemployment and that the act must be liberally construed to the end that provision be made for unfortunate persons out of employment. (*American Medical Assn.* v. *Board of Review*, 392 Ill. 614; *Zehender & Factor, Inc.*, v. *Murphy*, 386 Ill. 258; *Oak Woods Cemetery Assn.* v. *Murphy*, 383 Ill. 301.) In the *American Medical Association* and *Oak Woods Cemetery cases*, cited above, we have also held that the decisions and rules of the Federal authorities and administrative agencies relating to social security taxes are not binding on the courts.

In the *American Medical Association case* this court was called upon to determine whether or not the American Medical Association was exempt under the provisions of section 2(f)(6)(G) of the Unemployment Compensation Act and held that it was not. In so holding this court

recognized that an employer, in order to be exempt from unemployment contributions under the provisions of the statutory section in question, must be organized exclusively for one of the exempt purposes, which is to be determined from its charter and bylaws, and in addition thereto that such employer must operate exclusively for one of the exempt purposes, which question is to be determined from the actual facts relating to its method of operation. Even if an association organized and operated exclusively for an exempt purpose owns productive properties and carries on activities for private gain, yet if the income is used for the stated exempt purpose, and not for the benefit of its members, its exempt character is not thereby lost. However, in construing such exemption paragraph of the statute in question, we held that an association must be organized and operated "exclusively" for the exempt purpose, the word "exclusively" to be given its literal meaning. If the association is organized or operated in any substantial part for other than an exempt purpose and such organization or operation is not merely incidental to the main purpose and does not in any way contribute to such main purpose it cannot be said to be exclusively organized and operated for such purpose.

This court has not heretofore been called upon to determine what constitutes an exclusively religious purpose under the exemption provision of the Unemployment Compensation Act. However, this court in the past has had occasion to determine whether or not property was used for an exclusively religious purpose under exemption clauses of the general property tax laws of this State. In *People ex rel. Thompson* v. *First Congregational Church,* 232 Ill. 158, we held unconstitutional as applied to a church parsonage a section of the then existing Revenue Act which provided: "All church property actually and exclusively used for public worship and all parsonages or residences actually and exclusively used by persons devoting their entire time

to church work, when the said buildings and the land on which said buildings are located (said land to be of reasonable size for the location of said buildings) are owned by the congregation or the church authorities and not used for pecuniary profit." Section 3 of article 9 of our constitution provides that "The property of the state, counties and other municipal corporations, both real and personal, and such other property as may be used exclusively for * * * religious * * * purposes, may be exempted from taxation; but such exemption shall be only by general law." In holding such revenue provision unconstitutional as applied to a church parsonage we said, at page 162, "a church organization may own property which is used for church purposes but which is not used for religious purposes. The parsonage in this case was used as a home for the pastor and the members of his immediate family. So far as appears from this record, it was used as a family residence and nothing more. * * * there seems to be no ground upon which it can be successfully contended that it was used for a religious purpose any more than was the residence of any other christian gentleman who was a member of the same church. * * * The church might provide a residence upon real estate owned by it for its choirmaster or sexton. We presume that it would not be seriously contended that the property used by either of these persons as a residence is used exclusively for religious purposes, yet the statute under consideration is broad enough to include such a residence. Upon reason, the conclusion that the property involved in this suit is used primarily for a secular or temporal purpose, and not exclusively for religious purposes within the meaning of our constitution, seems irresistible."

In *People* v. *Deutsche Gemeinde,* 249 Ill. 132, a corporation claimed that its real estate was exempt from taxation under the then existing law which provided an exemption of "all property used exclusively for religious purposes

or used exclusively for school and religious purposes and not leased or otherwise used with a view to profit." The affidavit on which the claim of exemption was based set forth that the corporation was an institution of religious worship and that the property and building in question had been used by the corporation for religious and school purposes only and would be so used exclusively in the future and was not leased or otherwise used for any purpose of obtaining profit. Therein this exemption claim was denied.

In *Congregational Church* v. *Board of Review,* 254 Ill. 220, this court again had before it the question of exemption from property taxation of a church parsonage under the then existing revenue law which provided, "All property used exclusively for religious purposes * * * and not leased or otherwise used with a view to profit" should be exempted from taxes. In this case there was extensive detailed evidence pointing out rather fully the extent to which the parsonage was used for various purposes connected with the religious program of the church. Again this court held that the parsonage was not exempt from taxation.

In *People ex rel. Wilson* v. *St. Mary's Hospital,* 306 Ill. 174, a Roman Catholic church owned and had title to certain hospital property and claimed it to be exempt from property taxation under the then existing Revenue Act as being property used exclusively for religious purposes or as the property of a beneficient or charitable organization. This court denied such claim of exemption in its entirety, stating that in order to be exempt from taxation because used exclusively for religious purposes the property must be in fact used for such purposes, noting that the hospital was not used for religious purposes and was not owned by a charitable organization but by the church organization at the time of assessment.

In *People ex rel. Carson,* v. *Muldoon,* 306 Ill. 234, this court denied exemption from property tax, under the then

existing Revenue Act, of property which was in the name of the Catholic Bishop of Rockford and used to provide a monastery home for nuns of the Order of Poor Clares who had renounced all connection with the world and the public and who were maintained principally by charity.

Our attention has been called to no decision of this court attempting to lay down an all-inclusive definition or specification of what constitutes a religious purpose, although the foregoing cases clearly indicate that this court has repeatedly concluded that use of property for a parsonage or monastery or other residential purposes is use of the property for secular and not a religious purpose.

Courts of other States have reached similar conclusions. In *Ham Evangelistic Ass'n* v. *Matthews,* 300 Ky. 402, 189 S.W. 2d 524, 168 A.L.R. 1216, the question of exemption under a Kentucky statute providing "parsonages or residences owned by any religious society and occupied as a home by the minister of any religion" should be exempted from taxation was presented to the court. In that case an incorporated evangelistic association had organized under a religious corporation statute for the primary purpose of promoting the evangelistic work of an ordained minister and his wife but with authority to promote work of other evangelists whom the association might approve, the whole operation of which was centered about the founder who conducted evangelistic services throughout the country and over the radio, independent of any religious denomination, and the work of which was supported entirely by voluntary contributions from which the expenses of operation, including salaries of assistants, rentals of tabernacles or tents, costs of radio broadcasting, and the publication and distribution of religious tracts were paid, and against which the founder could draw for his own personal and living expenses without limitation, save only that checks were countersigned by the treasurer of the association. The corporation acquired title to residence property in Louisville

which was occupied as a home by the founder. The Kentucky court denied the claim to exemption.

In *United Brethren Publishing Company* v. *Shaffer,* 74 Ind. App. 178, 123 N.E. 697, it was held that a publishing concern incorporated as part of a church and engaged in publishing a church paper and Sunday school papers and other similar literature, the proceeds of which, over and above the expenses, were applied to the benefit of traveling and worn-out preachers and their widows and orphans, was not exempt from taxation on the ground that it was a religious or charitable organization, not being within the meaning of the statute exempting such institutions from taxation. The court stated in principle that it was not enough that the proceeds of the business were used for religious or charitable purposes, but that the institution itself must be for such purposes and must itself be a religious or charitable institution and not one organized for the purpose of profit.

In *Incorporated Trustees of Gospel Worker Society* v. *Evatt,* 140 Ohio St. 185, 42 N.E. 2d 900, about three quarters of the total cubage of a building owned by a religious society was used for the housing of printing machinery and equipment, and offices and warehouses needed in connection with the publication of a number of religious papers, tracts and pamphlets, and the net income from the sale of the publication was used to help finance the society's religious and charitable activities. It was held that the real and personal property of the society was not exempt from taxation under the constitutional and statutory provisions exempting from taxation property belonging to "institutions used exclusively for charitable purposes." The court declared the test for exempting property to be its present use rather than the ultimate use of the proceeds, and applying this test to the facts of that case decided against exempting the property from taxation because it was not used directly for charitable purposes but for producing income,

though the latter went exclusively for charity. There are other cases of like import: *American Sunday School Union v. Philadelphia,* 161 Pa. 307, 29 Atl. 26, 23 L.R.A. 695; *Gunter* v. *Jackson,* 130 Miss 637, 94 So. 844.

None of the above cases, except the *American Medical Ass'n case,* involves an exemption under unemployment compensation laws. However, in *Murphy* v. *Concordia Publishing House,* 348 Mo. 753, 155 S.W. 2d 122, 136 A.L.R. 1461, the Missouri Unemployment Compensation Commission sought to recover unemployment compensation contributions from the defendant incorporated publishing house, which was a subsidiary of a religious corporation known as the Evangelical Lutheran Synod of Missouri. Although the Synod was a religious or ecclesiastical body which owned all of the stock of the publishing house it was held that the publishing house was not exempt under the Unemployment Compensation Act as a corporation organized and operated exclusively for religious purposes, notwithstanding that the publishing house engaged exclusively in the manufacture and sale of articles necessary for the welfare of the church, school and the home, and that all of its earnings flowed into the general treasury of the church. The court there reaffirmed the proposition that exemption must be determined by the charter powers of the corporation and not by the ultimate destination of its net income, and the articles of incorporation in this particular instance permitted the corporation to carry on a publishing business. Shortly after this decision, the publishing company obtained a not-for-profit charter and continued in business in Missouri. Again the question of exemption from taxation arose as to the real estate. In *Evangelical Lutheran Synod of Missouri* v. *Hoehn,* 355 Mo. 257, 196 S.W. 2d 134, the Concordia Publishing House and its parent corporation sought to enjoin collection of real estate taxes in Missouri on the ground that the real estate involved "was and is exclusively used" for religious purposes. The publishing

house was competitive and run like any other similar business and had a large book display room where books could be purchased at retail. Most ·of the books sold were religious books but some were highly moral secular books. The company also printed religious periodicals and supplied materials to denominational churches and parochial schools. Profits were used for extension of its property or paid over to the Snyod. Gross sales of secular books amounted to less than 1 per cent of gross receipts. After reviewing the facts the court in the last cited case denied tax exemption to the organization, stating, "nor do we think the situation is altered here by the facts that nearly all the sales for profit were of religious literature and made mostly to members of the denomination. Many books are sold competitively and for profit to a limited public, such as law books to lawyers * * * A competitive commercial business operated for profit does not comply with that requirement even though the profits are devoted to religion."

With the foregoing decisions in mind, what does a further examination of the facts presented in the instant case disclose? Scripture Press Foundation was incorporated and organized by an individual and his wife, who although Christian persons with a long record of religious service, were neither ordained ministers, pastors, nor representatives of any ecclesiastical or church organization. No church or ecclesiastical organization was an incorporator or a member of the corporation. A study of its charter powers in the light of its actual operation indicates that Scripture Press Foundation was organized for the primary purpose of producing, distributing and selling religious literature and supplies to religious organizations. It is true that the language of its charter powers indicates a purpose for "The dissemination of the Gospel, the distribution of the Scriptures, of extracts therefrom, of devotional and other literature relating thereto, and of helps and supplies for use in Christian activities." Such purpose is accom-

plished only by the distribution and sale of such literature and supplies to religious organizations, which organizations in turn use them in conducting their religious activity. We are of the opinion that under the decisions of the Illinois courts and the language of the Illinois constitution and statute, such activities are secular in nature and not exclusively religious, the same as the maintenance of a parsonage for residential purpose of a pastor or the same as any other commercial service organization furnishing to a religious institution necessary services such as fuel, lights, building material or any other item necessary to its ordinary and customary functioning.

We do not believe that it would be seriously contended that either the real estate or personal property owned and used by Scripture Press Foundation in the conduct of its business would be exempt under Illinois law from property taxes as being used exclusively for religious purposes. The normal rules of logic and sound reasoning seem to dictate that if the property of an organization essential to its principal operation could not be considered as primarily devoted to an exclusively religious use under the Illinois law, then the primary purpose of such association would not be deemed to be an exclusively religious purpose under Illinois laws.

Although the corporate powers of Scripture Press Foundation also included "the organization and support of organizations, institutions and movements exclusively devoted to Christian missionary, educational and other evangelical efforts," the evidence fails to disclose any maintenance of missionaries in the field or the organization and support of any evangelical movement. The most that is shown by the evidence is assistance by the foundation to churches and Sunday schools in methods of organizing and setting up Sunday schools and various religious campaigns, the actual work thereof being performed by the other religious organizations to which the service was rendered.

Although we do not hold that the fact that an otherwise exempt institution may have income from its property and operations destroys its exempt status, it is pertinent to note in this particular instance that the income of Scripture Press Foundation is not turned over to or used by any religious society, church or organization. On the contrary, from an examination of the operations of Scripture Press Foundation, it clearly appears that none of its profits have been distributed but have been accumulated in its surplus account. Such surplus is apparently reinvested in the foundation's stock in trade and merchandise for resale to religious institutions. Such sales are consistently made at stated list prices which yield an overall substantial profit. Such practice would indicate a secular rather than exclusively religious operation.

In the course of its business, Scripture Press Foundation did have an unprofitable operation in its so-called *Sunday* magazine. The foundation's membership and board of directors thereupon organized a profit corporation and transferred the losing operation thereto, thus eliminating the unprofitable element from the foundation's operations. Such action is not questioned and apparently was within the foundation's power. All the foundation's assets are held either as an outright gift in absolute unrestricted ownership or as the increment of its operations since its creation. There is nothing appearing in the articles of incorporation or the bylaws of Scripture Press Foundation which impresses its assets with a trust or requires the assets of the foundation on dissolution to be transferred to an exclusively religious organization. The bylaws of the organization may be amended at any time by a majority action of the foundation's membership. Under the provisions of sections 45(d) and 45(e) of the general Not-For-Profit Corporation Act of Illinois the members and officers of Scripture Press Foundation, upon its dissolution, would deter-

mine, in their discretion, the manner in which its assets would be distributed, without limitation.

Considering all of the facts of this case in the light of authorities previously discussed, we are of the opinion that Scripture Press Foundation is not a foundation organized and operated exclusively for religious purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, but on the contrary is a not-for-profit corporation organized and operated for the purpose of rendering services to religious organizations on a business basis, and is therefore organized and operated for secular purposes as opposed to exclusively religious purposes. Consequently Scripture Press Foundation is not an exempt employer under the provisions of the Illinois Unemployment Compensation Act.

Scripture Press Foundation has placed its chief reliance for exemption upon the case of *Congregational Sunday School and Publishing Society* v. *Board of Review,* 290 Ill. 108, in which case it was contended that the publishing organization was exempted from payment of personal property taxes because its property was used "exclusively for religious purposes, or used exclusively for school and religious purposes," or for "charitable or beneficient purposes." The property in question consisted of religious and moral books and Sunday school supplies kept in the publishing company's branch store in Chicago. The publishing company had been formed by the consolidation of two private corporations in Massachusetts, where its main office was located, and the Chicago office was a branch established for handling Midwest business. The corporate charter purposes of the publishing company was to establish and aid Sunday schools, supply Sunday school libraries, and otherwise promote Sunday school education; to produce, publish, sell and circulate moral and religious tracts and books; and to publish, purchase, sell, circulate and distribute in such manner as it deems advisable any and all publications,

books, tracts, papers or periodicals calculated to promote good morals, pure Christianity, spread and extend the gospel of Jesus Christ and to take, hold and disburse any and all charitable funds contributed to it for the purposes aforesaid. The business of the publishing company was fourfold. It maintained a Sunday school missionary department which organized Sunday schools, and maintained missionaries who visited and assisted in the work of such schools. It published and circulated a religious paper and four other smaller religious periodicals. It published and sold religious and moral books. It composed and published Sunday school periodicals, quarterlies and lesson helps and sold such supplies to the Sunday schools of all denominations. The funds of the publishing company were raised by donations from Congregational churches, Sunday school, Christian Endeavour societies, missionary organizations and individuals, and by incomes from certain legacies, trust funds and investments, all of which were handled in Boston. The prices charged by the publishing company were such that in carrying on its business over a period of years there were practically no profits. In allowing the exemption, the Illinois court devoted practically its entire opinion as to whether the organization was a "charitable and beneficient" one within the meaning of the tax-exemption statute in question. At the start of its opinion this court stated, at page 112, "before proceeding further it is well to determine what is meant by the term 'beneficient and charitable organizations.'" It thereupon followed such statement with an eleven-page opinion devoted to reaching the conclusion that the publishing company was a charitable and beneficient organization. No place in the opinion is consideration given to whether the property was used exclusively for religious purposes. In no place in the opinion did the court refer to or discuss the case of *People* v. *Deutsche Gemeinde,* 249 Ill. 132, which appears to be the leading case in Illinois construing the words "religious pur-

poses." Scripture Press Foundation in the instant case makes no claim for exemption on the ground that it is organized and operatéd exclusively for "charitable purposes" within the meaning of section 2(f)(6)(G) of the Unemployment Compensation Act, but bases its claim for exemption solely on the fact that it is organized and operated exclusively for "religious purposes." Under such circumstances the *Congregational Sunday School and Publishing Society case* cannot be considered as authority for the proposition that the organization there involved was an exclusively religious organization.

Scripture Press Foundation also cites and relies upon *Trinidad* v. *Sagrada Orden,* 263 U.S. 578; *People* v. *Missionaries, Inc.,* 409 Ill. 370; and *Assessors* v. *Lamson,* 316 Mass. 166, 55 N.E. 2d 215. All of these cases are distinguishable from the case at bar. In the *Trinidad case* it was stipulated and agreed that the taxpayer was organized and operated for religious, benevolent, scientific and educational purposes. There were some profits from the occasional sales of products for use in its churches and missions. No sales were made to the general public and all income was used for religious, charitable and educational purposes.

In *People ex rel. Marsters* v. *Saletyni Missionaries, Inc.,* 409 Ill. 370, a seminary was organized as a charitable corporation by certain Catholic institutions to perform benevolent acts, to educate students and to conduct retreats in which the priests and nuns received no compensation for their work. This court in that case held that the property of the seminary was exempt from taxation as the property of an institution of public charity, it being determined that the primary purpose of the mission was dispensing of charity. The court in that case specifically pointed out that "the claim for exemption is not based upon the last clause of paragraph (2) of the section giving exemption when the property is, 'used exclusively for school and religious purposes.'"

In the *Lamson case* certain property used in publishing was held exempt from property taxes. The publication was the Christian Science Monitor, owned and operated by the Christian Science Organization, the net earnings of which were all paid over in their entirety to the First Church of Christ Scientist, and used for the promotion and extension of the religion of Christian Science. The holding in substance was that the property was a part of the church and its primary religious purposes and therefore exempt.

In view of our holding that Scripture Press Foundation was not organized and operated exclusively for religious purposes and therefore not entitled to exemption from the provisions of the Unemployment Compensation Act, we consider it unnecessary to consider other assignments of error.

The order and judgment of the circuit court of Cook County are reversed.

*Judgment reversed.*