No. 2--03--0006

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

COOK COMMUNICATIONS MINISTRIES, ) Appeal from the Circuit Court

) of Kane County.

Plaintiff-Appellee, )

)

v. ) No. 02--TX--4

)

THE DEPARTMENT OF REVENUE, ) 

)

Defendant-Appellant )

) Honorable

(Kane County Supervisor of Assessments and ) Michael J. Colwell,

Kane County State's Attorney, Defendants). ) Judge, Presiding.

______________________________________________________________________________

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiff, Cook Communications Ministries, applied for a real property tax exemption for  1999.  Defendant, the Illinois Department of Revenue (Department), denied the application, ruling that plaintiff's property was not "used exclusively for religious purposes" within section 15--40 of the Property Tax Code (Code) (35 ILCS 200/15--40 (West 1998)).  The circuit court reversed the Department.  The Department appeals, arguing that its decision was not clearly erroneous.  We agree and reverse.

Plaintiff owns 9.22 acres at 850 North Grove Avenue in Elgin.  As of 1999, the property was improved with a 190,000-square-foot building.  After the Department denied plaintiff's application for a tax exemption,  plaintiff appealed and presented evidence at a hearing before an administrative law judge (ALJ).  We summarize the evidence.

The sole witness at the hearing was David Hachtel, plaintiff's vice-president of finance since 1986.  He testified as follows.  In 1875, David C. Cook, a pastor, founded a sole proprietorship to print and distribute materials for children's Bible studies.  In 1884, the business incorporated, and it was family-owned and operated for profit until 1944.  In 1900 or 1901, the corporation (the C-Corp) bought the property at 850 North Grove.  Since then, the building has always been used primarily to print, warehouse, and ship nondenominational Christian educational publications, although books are printed off the site by commercial printers.

In 1944, a nonprofit corporation, the David C. Cook Foundation (the Foundation), was created.  According to its articles of incorporation, the Foundation's purposes are to encourage the acceptance of Jesus and his teachings; to advance Christian education "in churches, and Sunday schools, internationally, by Christian literature and literacy"; and to aid the needy and institutions of religious education, either directly or through established charities.  Article 6 states in part:

"(d) The net income of the corporation, as well as the principal and corpus of its funds and property, shall be applied exclusively for the Christian religious, charitable and public educational purposes for which the corporation is organized, and for no other purpose.  The corporation shall not engage in carrying on propaganda (other than the dissemination of Christian religious teachings), nor engage by any means in attempting to influence legislation.

(e) No incorporator, member, officer or employee of the corporation, and no person who shall have contributed to the funds or property of the corporation, shall receive, or be lawfully entitled to receive, any dividend, distribution or pecuniary profit from the corporation, nor any share or distribution of the assets therefrom, except that reasonable compensation may be paid to an officer or employee for services actually rendered for the corporation.

(f) In case of the dissolution of the corporation, all of the remaining funds and property of the corporation, if any, shall be paid and distributed to such Christian religious, charitable and public educational institution or institutions as the Board of Directors may deem appropriate, to be used exclusively for Christian religious, charitable and public educational purposes, and no part thereof shall accrue to, or be distributed or paid to, any incorporator, member, officer or employee of this corporation, nor to any person who shall have contributed to the funds or property of the corporation, nor to any person claiming by, through or under any such incorporator, contributor, member, officer or employee."

Hachtel testified that from its creation, the Foundation was exempt from federal taxes.  Between 1944 and 1952, the Cook family members who owned stock in the for-profit C-Corp donated all of their stock to the Foundation, making the Foundation the sole owner of the C-Corp.  In 1994, the Foundation adopted its present name, Cook Communications Ministries.  

Between 1986 and 1995, plaintiff made about 10 to 12 acquisitions.  Most were small Christian book publishers, but in 1986, the Foundation also bought Day Spring, a Christian greeting card company.  Starting in 1998, plaintiff gradually acquired the C-Corp's assets.  As of June 29, 1999, the C-Corp's only asset was Day Spring.  On July 16, 1999, the C-Corp took Day Spring's name and was sold to Hallmark.  At the hearing, Hachtel explained that Day Spring had been highly successful while plaintiff owned it, having "gone from revenue of $12 million to $50 million and *** doing so cost effectively."  However, this very success caused a disproportionate share of plaintiff's capital to go toward "gifts and cards" rather than the Sunday school curriculum and books.  The profits from the sale of Day Spring were used to reduce plaintiff's debt, set up an endowment for international ministries, build an addition to the structure at 850 North Grove, and upgrade office equipment.  With the sale of Day Spring, plaintiff now has no for-profit purposes.   

Hachtel testified that plaintiff is still exempt from federal taxation.  Plaintiff's corporate office is in Colorado Springs and is exempt from Colorado property taxes.  In October 1998, the Department notified plaintiff of its conclusion that plaintiff was "organized exclusively for religious purposes."  Thus, at least until March 1, 2003, any sales to plaintiff were exempt from the "Retailers' Occupation Tax, the Service Occupation Tax (both state and local), the Use Tax, and the Service Use Tax," although not from several other specified occupational or excise taxes. 

Plaintiff earns the vast majority of  its income by publishing Christian educational materials and selling them to churches, teachers, and Christian bookstores.  In the fiscal year ending May 31, 2000, plaintiff received $618,403 in contributions, gifts, or grants.  None of plaintiff's income is derived from fees charged for services.  Consistent with past practice, any profit that plaintiff makes from the operations formerly performed by the C-Corp funds either the "distribution" of plaintiff's publications or the training sessions plaintiff holds two to three times a year.  Plaintiff's distribution efforts are primarily international, with all materials "given with no money expected in return."  At the training sessions, the Foundation teaches people from abroad how to edit, publish, and distribute religious educational materials in their own countries.   

The ALJ admitted copies of plaintiff's tax returns for the fiscal years ending May 31, 1999, and May 31, 2000.  Discussing the first return, Hachtel noted that plaintiff's gross income for June 1, 1998, through May 31, 1999, was $51,564,398, which exceeded plaintiff's total expenses and disbursements by $8,362,406.  This extraordinary surplus resulted from the transfer of assets from the C-Corp to plaintiff.  Plaintiff's consolidated financial report for the same period, also admitted  into evidence, showed that factoring in "those portions that were still in the C-Corp" reduced the surplus to about $4.7 million.  In the period covered by the second tax return, June 1, 1999, through May 31, 2000, plaintiff's gross revenues were $66,858,491, but plaintiff actually lost $3,392,085.    Plaintiff employs about 650 people in all, with 175 to 200 of them in Elgin and the remainder in Colorado Springs.  For the fiscal year ending May 1, 1999, plaintiff's chairman was paid $92,400.  Five other employees received more than $50,000,  their salaries ranging from $73,600 to $83,820.  For the fiscal year ending May 31, 2000, plaintiff's chairman was paid $239,883.  Two other officers received $175,090 and $149,151, and the five remaining highest-paid employees' salaries ranged from $92,090 to $118,919.  Plaintiff's board of trustees consists of 3 officers and 11 outside individuals and meets twice a year for two days at a time.  Each trustee is paid $2,500 per two-day session.  Trustees customarily repay half or all of this amount, but they are not required to do so.  

The ALJ recommended denying the requested exemption.  The ALJ reasoned as follows.  Under section 15--40, "[a]ll property used exclusively for religious purposes *** and not leased or otherwise used with a view to profit, is exempt." 35 ILCS 200/15--40 (West 1998).  Plaintiff uses its property in Elgin to publish religious educational materials for others to use, thereby fulfilling plaintiff's goal of fostering Christian education. However, unlike a church or a Sunday school, plaintiff itself is unaffiliated with any church and does not itself conduct worship services or teach religion directly.  Thus, the Elgin property is not "used exclusively for religious purposes" in the traditional sense, 
i.e.
, "by a religious society or body of persons as a stated place for public worship, Sunday schools and religious instruction."  
People ex rel. McCullough v. Deutsche Evangelisch Lutherische Jehovah Gemeinde Ungeaenderter Augsburgischer Confession
, 249 Ill. 132, 136-37 (1911).  The ALJ further stated that, nonetheless, under more recent case law, the publication and distribution of religious materials may be either (1) primarily religious with incidental commercial aspects, and thus within section 15--40 of the Code; or (2) primarily commercial with religious overtones, and thus outside section 15--40.

The ALJ concluded that in 1999, plaintiff was the second type of enterprise, not the first.  The ALJ emphasized that the vast bulk of plaintiff's revenues came from the gross profits it made from the commercial sales of its publications.  Only a tiny percentage of plaintiff's income came from contributions.  Moreover, plaintiff's president received a large salary, and each of its trustees was paid $2,500 per two-day meeting although there was no evidence that this was reasonable compensation for the work done.  Therefore, plaintiff used the property primarily for a nonreligious purpose even after it liquidated the for-profit C-Corp midway through 1999.

The Department adopted the ALJ's recommendation and denied plaintiff the exemption.  On administrative review, the circuit court reversed the Department.  The Department timely appealed.  On appeal, the Department  argues that its decision to deny plaintiff a property tax exemption under section 15--40 of the Code is not manifestly erroneous.  For the reasons that follow, we agree.

We review the holding of the Department, not the ruling of the circuit court.  
Central Illinois Light Co. v. Department of Revenue
 (
CILCO
), 336 Ill. App. 3d 908, 911 (2003)
.  Here, the Department's task was to apply a given legal standard to undisputed facts.  Thus, the Department confronted a "mixed question of law and fact," and we must accept the Department's answer unless it is clearly erroneous.  See 
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 392-93 (2001); 
Du Page County Board v. Department of Revenue
, 339 Ill. App. 3d 230, 234 (2003).

The issue before the Department was whether, during 1999, plaintiff's property at 850 North Grove was "used exclusively for religious purposes *** and not leased or otherwise used with a view to profit."  35 ILCS 200/15--40 (West 1998).  In this context, "exclusively" refers to the primary purpose for which the property is used.  
Evangelical Hospitals Corp. v. Department of Revenue
, 223 Ill. App. 3d 225, 230 (1991).  Plaintiff had the burden to establish its entitlement to the exemption, with all debatable questions to be resolved in favor of taxation.  See 
CILCO
, 336 Ill. App. 3d at 912.

We agree with the Department and the ALJ that, throughout 1999, plaintiff's property was ineligible for the requested tax exemption because it was not used exclusively for a religious purpose.  Additionally, we conclude that until plaintiff disposed of the for-profit greeting card company, its property was not tax exempt because it was used with a view to a profit.  The Department's decision is not clearly erroneous and, indeed, is compelled by the case law.

We explain first why the case law compels a holding that plaintiff's property was not used exclusively, 
i.e.
, primarily, for a religious purpose.  The earliest pertinent opinion appears to be 
Congregational Sunday School & Publishing Society v. Board of Review
, 290 Ill. 108 (1919).  There, the plaintiff operated a missionary department that organized Sunday schools and maintained missionaries to assist these schools; published and circulated several religious periodicals; published and sold religious books; and published educational materials that it sold specifically to Sunday schools.  The plaintiff's Chicago store sold religious books and supplies.  The plaintiff relied on donations for its funds.  Over the long term, the Chicago store did not make a substantial profit, and profits it made in a given year were devoted to maintaining the missionary department.  
Congregational Sunday School
, 290 Ill. at 111-12.  

The plaintiff sought a personal property tax exemption for its Chicago property on two grounds: because the property was used exclusively for a religious purpose and because the plaintiff was an institution of public charity.  The supreme court considered these two grounds together because they were so "closely associated" under the facts of the case.  
Congregational Sunday School
, 290 Ill. at 112.   In allowing the exemption, the court reasoned that the plaintiff's dominant purpose was to spread the gospel and that the plaintiff did this directly by distributing its religious books and Sunday School supplies.  The court noted as well that plaintiff's work was "to send its workers and missionaries into those parts of our land where religious teaching among the young has been neglected, and there to take the young into Sunday schools for moral and religious instruction and provide for them wholesome literature."  
Congregational Sunday School
, 290 Ill. at 117.

In 
Scripture Press Foundation v. Annunzio
, 414 Ill. 339 (1953), the supreme court limited, if it did not partially abrogate, its holding in 
Congregational Sunday School
 by ruling that the mere publication and distribution of religious literature is not a religious purpose.  The plaintiff, a nonprofit corporation, published and distributed Christian literature.  It sought an exemption from unemployment compensation contributions on the ground that it was organized and operated exclusively for religious purposes.  
Scripture Press Foundation
, 414 Ill. at 341-42.  Relying on the corresponding property tax exemption, the supreme court held that the plaintiff was not exempt.  The court explained:

"[Plaintiff] was incorporated and organized by [people], who, although Christian persons with a long record of religious service, were neither ordained ministers, pastors, nor representatives of any ecclesiastical or church organization.  No church or ecclesiastical organization was an incorporator or a member of the corporation.  A study of its charter powers in the light of its actual operation indicates that [plaintiff] was organized for the primary purpose of producing, distributing and selling religious literature and supplies to religious organizations.  It is true that the language of its charter powers indicates a purpose for 'The dissemination of the Gospel, the distribution of the Scriptures, of extracts therefrom, of devotional and other literature relating thereto, and of helps and supplies for use in Christian activities.'  
Such purpose is accomplished only by the distribution and sale of such literature and supplies to religious organizations, which organizations in turn use them in conducting their religious activity.  We are of the opinion that *** such activities are secular in nature and not exclusively religious,
 *** the same as any other commercial service organization furnishing to a religious institution necessary services such as fuel, lights, building material or any other item necessary to its ordinary and customary functioning."  (Emphasis added.)  
Scripture Press Foundation
, 414 Ill. at 355-56.

The court observed that there was no evidence that the plaintiff itself engaged directly in religious activities such as maintaining missionaries in the field.  
Scripture Press Foundation
, 414 Ill. at 356.  Earlier, the court had noted that the plaintiff did not conduct Bible or Sunday schools.  
Scripture Press Foundation
, 414 Ill. at 343.  Also, it was "pertinent" that the plaintiff's profits were reinvested in production and sales at a profit and that, upon a dissolution, the plaintiff's assets could go to secular organizations or private individuals, including its officers.  
Scripture Press Foundation
, 414 Ill. at 357-58.  Finally, the court distinguished 
Congressional Sunday School
, questionably, in our view, on the ground that the earlier opinion interpreted only a statutory tax exemption for a "charitable and beneficent organization" and not one based on "religious purposes."  
Scripture Press Foundation
, 414 Ill. at 359-60.

Cases following 
Scripture Press Foundation
 have adhered to its distinction between  nonprofit  organizations that engage directly in religious activities, such as worship, missionary work, and religious education, and secular organizations that merely supply religious entities with materials to conduct such activities.  Thus, in 
Inter-Varsity Christian Fellowship v. Hoffman
, 62 Ill. App. 3d 798 (1978), the plaintiff sought a property tax exemption for its literature division, which prepared religious publications that it sold or, at times, gave away.  The cost of producing the materials regularly exceeded the revenue from the sales, and the literature division relied on donations for most of its revenues.  In ruling that the literature division used its property exclusively for a religious purpose, we distinguished 
Scripture Press Foundation
 on several grounds.  First, the plaintiff engaged directly in religious activities such as Christian education and the support of numerous missionaries in the field.  Second, 
on dissolution, the plaintiff would have to distribute its capital surplus to a religious or charitable entity.  Third,
 the plaintiff's literature division sold its publications at cost or less and made a profit only if it received sufficient donations.  
Inter-Varsity
, 62 Ill. App. 3d at 802-03.

In 
Evangelical Teacher Training Ass'n v. Novak
, 118 Ill. App. 3d 21 (1983) (
ETTA
), the plaintiff, a nonprofit association of religious educational institutions, promoted Christian education by sending its officers to lecture at religious colleges, advising religious educators on training seminary students, preparing materials for Bible courses that were written by faculty at member schools, and distributing its publications, often free, to libraries and schools.  
ETTA
, 118 Ill. App. 3d at 23.  In affirming the plaintiff's entitlement to a property tax exemption, the appellate court distinguished 
Scripture Press Foundation
 in several respects.  First, ETTA's constituents were religious organizations and its officers were ministers.  
ETTA
, 118 Ill. App. 3d at 25-26.  Second, upon dissolution, ETTA's assets would go to a charitable purpose.  
ETTA
, 118 Ill. App. 3d at 25.  Third, ETTA did far more than distribute religious materials to others; its officers were deeply involved in religious teaching, which served "to directly accomplish ETTA's corporate purpose, the promotion of Christian education, in a manner which could not be achieved through the mere sale or distribution of its books and religious materials."  
ETTA
, 118 Ill. App. 3d at 26. 

Although the foregoing opinions do not lay down a completely clear or rigid formula for deciding whether property is being used exclusively for a religious purpose,  they compel us to agree with the Department that plaintiff's property was not so used in 1999.  Plaintiff was founded many years ago by a pastor, but there is no evidence that in 1999 it was affiliated with any religious organization or that its officers were members of the clergy.  More importantly, the evidence overwhelmingly shows that in 1999, plaintiff directly engaged in little or no specifically religious activity and used its Elgin property for no such purpose.  Instead, like the plaintiff in 
Scripture Press Foundation
, but unlike those in 
Hoffman
 and 
ETTA
, plaintiff achieved its corporate purpose, advancing Christian education, almost entirely by selling Christian educational materials to organizations that then did the actual teaching.  Plaintiff itself did no religious teaching.  Moreover, plaintiff received the bulk of its revenues either from such sales or from selling items produced by its for-profit greeting card company.  Only a tiny portion of plaintiff's revenues came from contributions, and plaintiff made a profit in one of the two fiscal years that included part of calendar year 1999.

We recognize that, unlike the plaintiff in 
Scripture Press Foundation
, plaintiff here did not routinely make a profit and, upon a dissolution, it could not distribute its net income or assets to private parties.  However, we do not believe that these factors are dispositive here.  The clear import of the excerpt that we have quoted from 
Scripture Press Foundation
 is that, when a secular nonprofit organization does not directly engage in religious activities but merely supplies materials to assist others in doing so, the organization is not using its real property "exclusively for religious purposes."  35 ILCS 200/15--40 (West 1998).  The additional factors that plaintiff cites do not refute the inescapable conclusion that plaintiff did not use its property primarily for religious purposes.  At most, they tend to prove that plaintiff did not use its property "with a view to profit" (35 ILCS 200/15--40 (West 1998)), although, as we shall discuss, even that conclusion must be qualified.

Plaintiff insists that its case is similar to 
Congregational Sunday School
 and that a similar result is required.  However, in view of the supreme court's later decision in 
Scripture Press Foundation
, 
Congregational Sunday School
 is of dubious validity, at least as a precedent for construing section 15--40's exemption of property that is used exclusively for "religious purposes."  35 ILCS 200/15--40 (West 1998).  Also, 
Congregational Sunday School
 is distinguishable on its facts.  There, the plaintiff did not merely produce and distribute materials for others to use in religious instruction but engaged directly in organizing and conducting religious instruction itself.  Furthermore, the plaintiff did not receive most of its revenues from sales but relied heavily on donations to stay solvent.  Thus, even if 
Congregational Sunday School
 is relevant precedent, this case more nearly resembles 
Scripture Press Foundation
.  To the extent that the precedents are ambiguous, the Department's application of them to the facts here was not clearly erroneous.  See 
Du Page County Board
, 339 Ill. App. 3d at 235.
(footnote: 1)  

There is another compelling reason to hold that plaintiff did not satisfy section 15--40 for at least part of 1999.  For approximately half that year, plaintiff's property was used in part for the operations of Day Spring, a for-profit company.  From Hachtel's testimony, it is evident that the company did make a profit and that it also made a huge contribution to plaintiff's revenue.  Indeed, Day Spring was sold because it was becoming too successful.  Thus, until plaintiff divested itself of Day Spring, its property was being used in large part "with a view to profit" (35 ILCS 200/15--40 (West 1998)) and was therefore ineligible for the requested exemption. 

 It is of no moment that the profits Day Spring made were plowed back into plaintiff's nonprofit operations.  See 
Salvation Army v. Department of Revenue
, 170 Ill. App. 3d 336 (1988) (property devoted to for-profit thrift store owned by plaintiff charitable organization was not eligible for tax exemption even though profits went to fund plaintiff's charitable operations).  Also, while we do not know exactly what portion of the property was used for Day Spring's needs, it was undoubtedly significant (and, in any event, any doubt would have to be resolved against plaintiff).  When the property in unidentifiable portions is used both for an exempt purpose and a nonexempt one, the property will be wholly exempt only if the exempt use is primary and the nonexempt use is incidental.  
Evangelical Hospitals Corp. v. Department of Revenue
, 223 Ill. App. 3d 225, 231 (1991).  Day Spring's use of the facility can hardly be characterized as incidental.  Thus, even were plaintiff's other operations tax-exempt, we would hold that for as long as Day Spring operated out of the Elgin facility, the property as a whole was ineligible for the requested exemption. 

 
The judgment of the circuit court of Kane County is reversed.

Reversed.

BOWMAN and GILLERAN JOHNSON, JJ., concur.

FOOTNOTES
1: The ALJ's (and thus the Department's) emphasis on the compensation paid plaintiff's officers and trustees seems misplaced. Whether this compensation is excessive is debatable, and, even if the officers and trustees were overpaid, the amounts involved were so slight in relation to the scale of plaintiff's operation that we would hesitate to rely on this consideration as a ground to uphold the Department's decision.  However, there are more than sufficient grounds to affirm the Department in any event, so its questionable reasoning in one respect is of no consequence here.