# Illinois Official Reports

## Appellate Court

---

> ### *By The Hand Club For Kids, NFP, Inc. v. Department of Employment Security*,
> ### 2020 IL App (1st) 181768

---

| | |
|---|---|
| Appellate Court Caption | BY THE HAND CLUB FOR KIDS, NFP, INC., Plaintiff-Appellee, v. THE DEPARTMENT OF EMPLOYMENT SECURITY, THE DIRECTOR OF EMPLOYMENT SECURITY, THE BOARD OF REVIEW OF THE DEPARTMENT OF EMPLOYMENT SECURITY, and KIM E. WIMBERLY, Defendants (The Department of Employment Security, the Director of Employment Security, and the Board of Review of the Department of Employment Security, Defendants-Appellants). |
| District & No. | First District, Third Division<br>No. 1-18-1768 |
| Filed | December 30, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2017-L-050886; the Hon. James M. McGing, Judge, presiding. |
| Judgment | Circuit court affirmed; Board decision reversed. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Janon E. Fabiano, Assistant Attorney General, of counsel), for appellants. |

Sally R. Wagenmaker, Paul Z. Winters, and Jonathan S. Hwang, of Wagenmaker & Oberly, LLC, of Chicago, Erik Stanley and Jeremiah Galus, of Alliance Defending Freedom, of Scottsdale, Arizona, and David A. Cortman, of Alliance Defending Freedom, of Lawrenceville, Georgia, for appellee.

Panel          JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justice Ellis concurred in the judgment and opinion.
Justice Cobbs dissented, with opinion.

## OPINION

¶ 1        The Department of Employment Security, its director, and its Board of Review (Board), which we will refer to collectively as IDES, appeal from a circuit court judgment reversing the Board's determination that By The Hand Club For Kids, NFP, Inc. (By The Hand), is not exempt from the Unemployment Insurance Act (Act) (820 ILCS 405/100 *et seq.* (West 2016)). By The Hand, which is separately incorporated from Moody Church, operates a nonprofit afterschool program in Chicago. The dispositive issue is whether By The Hand demonstrated to the Board that it is an organization "operated primarily for religious purposes" within the meaning of the exemption stated in section 211.3(A)(2) of the Act. 820 ILCS 405/211.3(A)(2) (West 2016). It is undisputed that By The Hand meets the two other requirements for exemption in that it is "not an institution of higher education" and that it is "operated, supervised, controlled or principally supported by a church." 820 ILCS 405/211.3(A)(2) (West 2016).

¶ 2        Kim E. Wimberly was By The Hand's human resources director and volunteer coordinator between 2015 to 2016, earning approximately $32,000 per year. Wimberly subsequently filed for unemployment compensation. By The Hand opposed the claim, contending she was ineligible for benefits because By The Hand was exempted by the statute that is cited above and because she left her job voluntarily. After an IDES local office determined that Wimberly's employment was "insured work," however, By The Hand appealed, and the question of its statutory obligation proceeded to a hearing.

¶ 3        The hearing officer heard testimony from Julie Heth, By The Hand's director of human resources and volunteer development; Marc Kole, By The Hand's senior director of finance, and Tom Sawyer, By The Hand's principal officer and board chair. Sawyer also held positions with Moody Church, as the vice chair of the church's board of trustees and as the vice chair of the church's board of elders, which is Moody Church's governing body. Donnita Travis, a long-term member of the church and the founder and executive director of By The Hand, could not attend the hearing but submitted an affidavit. The testimony, sworn statement, and other documents established the following.

¶ 4        The afterschool program was started in 2001 by Travis, who proposed the idea to the board of elders after the idea of a "holistic" afterschool program came to her in 1997 during a two-

day retreat that she took to consider her career. Travis wanted to be "sharing the gospel, praying, teaching the bible every step of the way and getting kids and families in church." The organization's office is located at 1635 North La Salle Drive in Chicago, Illinois, and participants in the afterschool program meet at five locations in Chicago, two of which are located in churches and three of which are located in commercial buildings. The program started with 16 students meeting in the Cabrini–Green community and has expanded to the Altgeld, Austin (two locations), and Englewood neighborhoods. Each location can accommodate 160 to 300 students.

¶ 5    An Illinois not-for-profit corporation named "Kids' Club North America, NFP" was formed in 2005 and renamed "By The Hand Club for Kids, NFP" in 2007. Articles of incorporation provide that By The Hand is "organized and operated exclusively for religious and charitable purposes." Travis described the "corporate purpose of By The Hand" as "an expression of the Biblical Book, the Gospel of John, chapter 10, verse 10, 'I have come that I might bring life and bring life more abundantly.' " Bylaws indicate the organization's "General Purposes" are "religious and charitable purposes" and that By The Hand "is a Christ-centered, after school program that helps children have an abundant and eternal life by nurturing the whole child—mind, body and soul." In addition, "For the mind[,] we have homework help, tutoring, language and reading literacy programs. For the body[,] we provide health education and access to health services, as well as a meal program. For the soul, we teach and model biblical truths." The bylaws also include a "Doctrinal Statement" consisting of more than a page of single-spaced text setting out Christian beliefs. The bylaws require By The Hand to obtain approval of Moody Church's board of elders for certain acts, including electing By The Hand's directors, adopting an annual budget, encumbering the corporation's assets, and amending the articles of incorporation or bylaws.

¶ 6    Participation in the program is free of charge. By The Hand's 2016 budget was about $8 million, nearly all of which was contributed by individual and "institutional donors and foundations" in response to solicitations indicating that the program improves literacy skills. Chicago Public Schools remits $200,000 of the $245,000 that is spent on meals. Moody Church adds $100,000 to compensate By The Hand's executive director; however, the long-term incumbent (program founder Travis) has never taken a salary. The corporation applied to the Internal Revenue Service and was granted tax-exempt status as a public charity as described in section 501(c)(3) of the Internal Revenue Code, due to the source of its funding. 26 U.S.C. § 501(c)(3) (2012).

¶ 7    Staff members are required to be Christian and to annually sign the program's statement of faith and "biblical standards of living." However, all children, regardless of their religious background, are welcome in the program. Parents and children are told that By The Hand "teaches Christian-based principles on a daily basis." By The Hand considers its employees and volunteer personnel to be ministry workers as they lead Bible study and chapel service, discuss faith and morals, and pray with the children. According to Heth, prayer occurs often. When asked which parts of the program she would characterize as ministry, Heth responded, "Every part of the program."

¶ 8    Each of the five locations posts the John 10:10 Bible verse in the classrooms and lobby, and with few exceptions, Christian music is played in the vehicles that transport the children from their schools to the program locations and field trip sites. Every child receives a Bible and an "evangelistic gospel track" upon enrollment (provided that the parents consent). Chapel

services, which are frequent, include time not only for a speaker and prayer but also memorization of a Bible passage. The children are taught a code of conduct which is known as "A-OK for Jesus," in which the "A" is short for paying attention to adults and the surroundings, the "O" is for being obedient to the organization's rules, and the "K" is short for being kind to "every person at By The Hand." Students must abide by a dress code. They are not permitted to use their cell phones during program time.

¶ 9     If it appears that a child needs an eye exam or dental care, By The Hand assists them in obtaining those services. Some providers do not charge By The Hand for their services.

¶ 10     The majority of the program's participants attend approximately 17 Chicago Public Schools. Teachers will sometimes recommend a child, and parents will ask that a child be included in the program. By The Hand prioritizes admittance to children who have deficiencies in literacy. During the school year, the program runs five afternoons per week, from approximately 3:30 p.m. to 6:30 p.m. On Mondays, Tuesdays, Wednesdays, and Fridays, there is about an hour for a meal, which Heth described as "the best time [for employees and volunteers] to build relationship[s]" with the children by discussing matters of faith, morals, and character. Three or four staff members will serve food and free up the other adults to pray and converse with the children. This is followed by about 30 minutes of chapel or Bible reading and then 20 minutes each of homework assistance, reading improvement, and reading aloud. To improve reading comprehension, By The Hand utilizes the Lexia self-study software and has a reading specialist at each site. During read-aloud rotation, the children and staff will read and discuss material from the Bible or a similar source. On Thursdays, there is a meal and homework help, but the usual reading enrichment time is shortened, so that time in chapel and Bible study can be increased to at least an hour. During chapel, By The Hand uses the "Evangelism Explosion" curriculum to teach children about evangelical Christian faith. Each of the five locations has a spiritual development director to ensure consistency in the chapel services and Bible studies. According to Heth, "We are praying all the time." The high school students take field trips on Thursdays during the school year to GRIP, which is a Christ-centered urban youth ministry. The lower grades might take a field trip once a month to visit a church or to gather with participants from all five of By The Hand's locations for "Bible bowl," which quizzes the students' recollection of scripture. Additionally, By The Hand runs a five-week summer program that places less emphasis on reading enhancement exercises and includes cultural field trips, Christian-oriented activities such as concerts, and college visits.

¶ 11     By The Hand's team leaders move up with their students until the fourth, seventh, and ninth grades so that the staff deepens their relationships as Christian role models to the children and their parents. In order to solidify those relationships, team leaders go to the enrolled children's schools for report card pick-up days and to confer with the teachers on the educational needs of the children, and they visit the children's homes each quarter.

¶ 12     By The Hand tracks attendance and retention, "informal reading scores," and the number of participants who have professed their faith and are attending church.

¶ 13     During the hearing, By The Hand submitted two documents in which IDES indicated By The Hand was not required to contribute to the unemployment compensation system. In a February 2008 letter, IDES exempted By The Hand because it was "a church or part of a convention or association of churches." The letter does not indicate why it was issued, *i.e.*, it does not indicate that By The Hand applied for the exemption as a new employer or that a former employee made a compensation claim. December 2009 correspondence was from an

- 4 -

administrative law judge who concluded that a former By The Hand employee was not entitled to unemployment benefits because she had been employed by "a church." The administrative law judge who presided over Wimberly's claim found that neither document supported By The Hand's contention that IDES had historically exempted By The Hand under section 211.3(A)(2), given that neither document referred to that section of the Act and both letters incorrectly identified By The Hand as a church, which would implicate a different section of the statute, section 211.3(A)(1). 820 ILCS 405/211.3(A)(1), (2) (West 2016).

¶ 14		Based on the information presented, the administrative law judge determined that, with respect to Wimberly's claim, By The Hand was being operated, supervised, controlled, or principally supported by Moody Church but could not qualify for section 211.3(A)(2)'s exemption because it was not operating primarily for religious purposes. 820 ILCS 405/211.3(A)(2) (West 2016). Instead, the evidence showed that By The Hand "primarily *** provides meals, homework help, and reading-improvement guidance to city youths" which are "activities *** more in the nature of being secular and charitable than they are religious." And, although By The Hand incorporates chapel service and Bible reading time on a regular basis, "the evidence clearly shows that the religious activities are secondary [purposes]" of the program.

¶ 15		When By The Hand appealed to the Board, the Board also rejected the conclusion that the organization was operating primarily for religious purposes. The Board reasoned that a stated religious purpose or mission did not preclude the Board from examining what By The Hand was actually doing and that "the insertion of evangelism into every facet of its program did not change the [secular] nature of the [afterschool] program." The Board stated:

> "As provided in their Bylaws, the employer[ ] seek[s] to minister to the mind, body and soul of the participants to its program. In furtherance of its mission, the employer provides meals, homework help, vocabulary building, and reading-improvement guidance to children. It also provides dental and vision help ***. While evangelism occurs throughout the program, the actual functions and activities are not changed by the evangelism incorporated into these activities."

¶ 16		By The Hand filed for administrative review, and the circuit court ruled that IDES had erred. It is from this ruling that IDES appeals. We need not outline the circuit court's reasoning because our role is to review the agency's ruling not the circuit court's ruling. See, *e.g.*, *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210, 86 N.E.2d 1011, 1018 (2008).

¶ 17		The standard of review in administrative actions, which determines the degree of deference given to the agency's decision, varies, as it depends upon the issue presented. *Cinkus*, 228 Ill. 2d at 210. Here, because the historical facts are established and the issue presented is whether the facts satisfy a statutory standard, the issue is considered a mixed question of fact and law that we will review under the clearly erroneous standard. *Cinkus*, 228 Ill. 2d at 211 (citing *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395, 763 N.E.2d 272, 280 (2001)). Under this standard of review, we are to give somewhat less deference to the Board than we would if its decision concerned solely a question of fact because the decision is based upon fact-finding that is inseparable from the Board's application of law to fact. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369, 776 N.E.2d 166, 177 (2002). This standard of review is deferential to an agency's experience in construing and applying the statutes that it administers. *AFM Messenger Service*,

198 Ill. 2d at 394. Even so, this standard does not mean "that a reviewing court must blindly defer to the agency's decision." *AFM Messenger Service*, 198 Ill. 2d at 395. A decision is clearly erroneous when there is some evidence to support the agency's decision, but after considering the entire record, the reviewing court is " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service*, 198 Ill. 2d at 393 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 18    In our analysis, we are to be mindful that the Act's purpose is to "provide economic relief to those who are involuntarily unemployed, through the collection of compulsory contributions from employers and the payment of benefits to eligible unemployed persons." *Western & Southern Life Insurance Co. v. Edmonson*, 397 Ill. App. 3d 146, 151, 922 N.E.2d 1133, 1139 (2009) (citing 820 ILCS 405/100 (West 2006) (indicating that businesses with employees based in Illinois are required to contribute to the unemployment benefits system)). Furthermore, exemption language is to be strictly construed and all debatable questions must be resolved against exemption. *Scripture Press Foundation v. Annunzio*, 414 Ill. 339, 347-48, 111 N.E.2d 519, 524 (1953) (addressing unemployment compensation claim against nonprofit publisher-distributer of Christian religious literature, Sunday school supplies and merchandise used by Sunday schools and churches); *Bethania Ass'n v. Jackson*, 262 Ill. App. 3d 773, 777, 635 N.E.2d 671, 675 (1994) (unemployment compensation claim against nonprofit association of 14 Lutheran congregations that owned and operated cemeteries, in which court stated "exemption provisions are strictly construed with uncertainties resolved in favor of inclusion").

¶ 19    An entity that claims to be exempt bears the burden of establishing its entitlement to the exemption and the evidence supporting its exemption must be clear and conclusive. *Faith Builders Church, Inc. v. Department of Revenue*, 378 Ill. App. 3d 1037, 1042, 882 N.E.2d 1256, 1261 (2008) (property tax appeal regarding church operating a preschool); *Scripture Press Foundation*, 414 Ill. at 347-48 (indicating party claiming unemployment compensation exemption must clearly show its factual and legal basis).

¶ 20    The Act provides in part:

"[T]he term 'employment' shall not include services performed

A. In the employ of (1) a church or convention or association of churches, or (2) an organization or school which is not an institution of higher education, which is operated primarily for religious purposes and which is operated, supervised, controlled or principally supported by a church or convention or association of churches[.]" 820 ILCS 405/211.3 (West 2016).

¶ 21    Courts generally have been " 'quite cautious in attempting to define, for tax [and unemployment insurance] purposes, what is or is not a "religious" activity or organization—for obvious policy and constitutional reasons.' " *Community Renewal Society v. Department of Labor*, 108 Ill. App. 3d 773, 779, 439 N.E.2d 975, 978 (1982) (quoting Bruce R. Hopkins, *The Law of Tax-Exempt Organizations* § 8, at 132 (3d ed. 1979)). Instead, a court will consider all the facts and circumstances of a particular case in order to decide whether an organization is engaged in primarily religious activities. *Community Renewal Society*, 108 Ill. App. 3d at 779 (citing *Scripture Press Foundation*, 414 Ill. 339, and George D. Braden & Rubin G. Cohn, *The Illinois Constitution: An Annotated and Comparative Analysis* 438-39 (1969) (applicability of exemptions typically presents factual questions "not readily controlled by definitive standards")). We, too, will examine all the facts and circumstances to determine the primary issue on appeal.

¶ 22      Appellant IDES contends that By The Hand failed to show that it is operating primarily for religious purposes. IDES contends that By The Hand's motives are not dispositive. It contends that the evidence indicates children in the afterschool program spend the majority of their time in secular activities including taking meals, doing homework, and participating in reading improvement exercises and the minority of their time "engaged in the spiritual component of the program." The evidence also shows that staff consult with schoolteachers about the individual pupils' reading deficiencies and are at the schools for every report card distribution day, which are nonreligious concerns. In addition, when needed, the afterschool program facilitates dental and vision care for the children by contacting treatment professionals (who might or might not charge for their services) and providing transportation for that care. IDES contends that when one considers the activities that the children and staff engage in, as the court did in the most factually analogous case, *St. Augustine's Center*, then it becomes apparent that By The Hand is primarily a nonreligious program that is not entitled to the statutory exemption it has claimed. *St. Augustine's Center for American Indians, Inc. v. Department of Labor*, 114 Ill. App. 3d 621, 449 N.E.2d 246 (1983). Furthermore, due to the similar language and purpose of section 211.3(A) of the Act and section 3309(b)(1) of the Federal Unemployment Tax Act (FUTA) (26 U.S.C. § 3309(b)(1) (2012)), this court has previously cited a report of the House Ways and Means Committee on the Employment Security Amendments of 1970 that suggested that " 'a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) would not be considered under [the federal act] to be operated primarily for religious purposes.' " *Community Renewal Society*, 108 Ill. App. 3d at 781 (quoting H.R. Rep. No. 91-612, at 44 (1969)); 820 ILCS 405/211.3(A) (West 2016). From IDES's perspective, the Board ruled correctly based on the undisputed evidence and its determination that there were "great parallels" between the facts of *St. Augustine's Center* and By The Hand's operations. *St. Augustine's Center*, 114 Ill. App. 3d 621.

¶ 23      Appellee By The Hand responds that the record indicates its afterschool program is a ministry of Moody Church in which caring for the academic and physical needs of vulnerable children shows them the love of Jesus and leads them "by the hand" to the abundant and eternal life that comes through a personal relationship with Jesus. Looking at its activities, By The Hand hires Christians who agree with the church's religious beliefs and are disciples of Jesus in their daily lives. By The Hand points out that its Christian staff lead the children with Bible lessons, prayers, and chapel services every day. By The Hand "even measures its success in large part on whether children enter into personal and saving relationship with Jesus Christ and become involved in a local church." By The Hand argues that no organization operated primarily for secular purposes would engage in these religious activities. By The Hand argues that a host of cases regarding parochial schools and other religion-affiliated organizations lead to this conclusion and that *St. Augustine's Center* and other authority cited by IDES are readily distinguishable. *St. Augustine's Center*, 114 Ill. App. 3d 621. According to By The Hand, both the facts and law indicate that the afterschool program qualified for section 211.3(A)'s exemption, and this court should reverse the Board's erroneous decision. 820 ILCS 405/211.3(A) (West 2016).

¶ 24      Whether an afterschool program qualifies for a religious purposes exemption from the Illinois unemployment compensation system is a case of first impression. As pointed out above, each exemption case must be determined on its individual facts, but we agree with By

The Hand's contention that parochial school cases, particularly *Unity Christian School*, are the most factually similar cases and that they should frame our analysis of whether By The Hand is an exempt employer. *Unity Christian School v. Rowell*, 2014 IL App (3d) 120799, 6 N.E.3d 543; see *Community Renewal Society*, 108 Ill. App. 3d at 779 (adopting a flexible, case-by-case determination in place of the narrow and fixed definition of "religious purposes" previous courts had used). In *Unity Christian School*, the court could not "fathom a different primary purpose other than religion" for the parochial school program it examined. *Unity Christian School*, 2014 IL App (3d) 120799, ¶¶ 30-31.

¶ 25 That case concerned a school in Fulton, Illinois, whose purpose and methodology were similar to those of By The Hand's purpose and methodology. The stated mission of Unity Christian School was " '[i]n covenant with Christian families, *** [to] teach[ ] [preschool through secondary school] students the Truth from a Christ-centered perspective for lives of discipleship.' " *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 8. The school's constitution declared that the foundation of its Christian program was the " 'Creator-creature relationship taught in the scriptures.' " *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 8. The school principal testified that the intention for the program was to provide pupils with "a proper religious education." *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 6, 6 N.E.3d 543. The appellate court's summation was that the school's primary goal was to "incorporate faith into the everyday life and education of its students." *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 32. Similarly, By The Hand's bylaws describe its program as "a Christ-centered, after school program that helps children have an abundant and eternal life by nurturing the whole child—mind, body and soul" and specify, "For the soul, we teach and model biblical truths." By The Hand's bylaws continue with a "Doctrinal Statement" setting out Christian beliefs in considerable detail, and all staff are required to regularly attest to not only their adherence to these religious beliefs but also their regular attendance at a "Bible believing local Church."

¶ 26 In addition to having similar foundations and aspirations, the school in Fulton and the afterschool program in Chicago set about achieving their goals in similar ways. Both incorporate prayer in all aspects of their programs, not just at certain times of the day or in certain classes, and the record indicates that By The Hand's staff and children pray together frequently. *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 6. Both programs are centered around the Bible. *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 6. The Fulton teachers were "expected to integrate biblical principles into all the subjects." *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 6. By The Hand considers its staff to be ministry workers as they guide children through Bible studies, lead daily chapel service that includes prayer and memorization of a Bible passage, and have discussions about Christian principles. By The Hand gives each new student a Bible and an "evangelistic gospel track," posts the John 10:10 Bible verse throughout its five locations, and plays Christian hip hop, gospel, and contemporary music while transporting the children. Even the participants' code of conduct, which is known as "A-OK for Jesus," references Christianity. By The Hand uses the "Evangelism Explosion" curriculum to coach children in the evangelical Christian faith. Mealtime is another opportunity for prayer and is considered "the best time [for employees and volunteers] to build relationship[s]" with and influence over the children. A handful of staff members will serve food in order to free up the other adults to pray and converse with the children. Furthermore, By The Hand's team leaders move up with their students until the

fourth, seventh, and ninth grades so that the staff can develop greater influence as Christian role models. In order to solidify those relationships, team leaders meet with teachers and parents each quarter by visiting the children's schools and homes. The high school students take field trips on Thursdays during the school year to GRIP, which is a Christ-centered urban youth ministry. The lower grades might take a field trip once a month to visit a church or to gather with participants from all five of By The Hand's locations for "Bible bowl," which quizzes the students' recollection of scripture. Additionally, By The Hand runs a five-week summer program that places less emphasis on reading enhancement exercises and includes cultural field trips and Christian-oriented activities such as concerts. The Fulton students attended chapel services once or twice a week, depending on their age (*Unity Christian School*, 2014 IL App (3d) 120799, ¶ 6), while the Chicago students attend chapel services every day, with a longer service once a week, on Thursdays, in lieu of formal reading enhancement exercises. By The Hand's team leaders track the children's homework completion, "informal reading scores," "behavior," and attendance. The program's goal is to retain 80% of its students because "[t]he longer students are enrolled[,] *** the better impact we can make on their lives" and "[we want] to take kids from kindergarten through college." In addition to academic matters, By The Hand keeps records of whether "the students have accepted Christ, go to church [(outside of the afterschool program's mandatory chapel services/bible study)], *** and [have] taken any small group classes like discipleship and mentoring." In other words, every aspect of the afterschool program is based on religious principles, and every possible opportunity is used to steer the participants toward religious values and faith. None of these religious activities are optional or avoidable other than by no longer attending the Fulton school or the Chicago afterschool program. Both programs engage in pervasive faith-based practices.

¶ 27    IDES determined that the Fulton school's curriculum was " 'primarily secular in nature' " (emphasis omitted) (*Unity Christian School*, 2014 IL App (3d) 120799, ¶ 11), which the appellate court acknowledged, but it then pointed out that grade schools and high schools were required by Illinois law to teach secular subjects. *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 32. Focusing on whether the curriculum included secular topics such as mathematics or grammar was missing the point of why the school existed: "If the parents of [the] students wanted them to attend a school that did not incorporate the principles of their Christian faith, they would simply send them to public schools." *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 32. "[T]he primary purpose of [this particular] school is to teach those secular subjects in a faith-based environment." *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 33. In concluding that Unity Christian School was "operating primarily for religious purposes," the court pointed out that "Religion is [Unity Christian School]'s *raison d'etre*." *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 29, 32.

¶ 28    *Unity Christian School* was filed in early 2014, more than two years before Wimberly's employment ended. Inexplicably, however, the Board's decision in mid-2016 does not address *Unity Christian School*. Even more perplexing are IDES's erroneous contentions here that *Unity Christian School* created a test that looked solely at the school's professed motives and that the court rendered an outlying opinion. Actually, the Illinois court had the benefit of a large number of federal and other states' opinions regarding entities claiming a religious purposes exemption, including exemption under the wording at issue, as section 211.3(A) adopted the language of a federal statute verbatim. *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 27.

¶ 29     The court, for instance, considered a decision of the Iowa Supreme Court regarding unemployment compensation claims against three Lutheran parochial schools that, like By The Hand, had been separately incorporated from the churches that formed them. Like the Illinois statute, the Iowa statute at issue in *Community Lutheran School* exempted "an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches." *Community Lutheran School v. Iowa Department of Job Service*, 326 N.W.2d 286, 287-88 (Iowa 1982) (quoting FUTA, 26 U.S.C. § 3309(b) (1976), as identical to Iowa Code § 96.19(7)(a)(6)(a), (b), (c) (1977)).

¶ 30     In its analysis, the Iowa court referred to the United States Supreme Court's discussion in *Lemon* indicating that parochial schools have a religious purpose. *Community Lutheran School*, 326 N.W.2d at 290 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). "In *Lemon* the Court noted that church-related elementary and secondary schools have a 'significant religious mission and that a substantial portion of their activities is religiously oriented.' " *Community Lutheran School*, 326 N.W.2d at 290 (quoting *Lemon*, 403 U.S. at 613). "[T]he various characteristics of the schools make them 'a powerful vehicle for transmitting the Catholic faith to the next generation.' This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly. *** [P]arochial schools involve substantial religious activity and purpose." *Community Lutheran School*, 326 N.W.2d at 290 (quoting *Lemon*, 403 U.S. at 616). In a concurring opinion, Justice Douglas commented on the "admitted and obvious fact" that parochial schools exist to propagate religious faith. *Lemon*, 403 U.S. at 628 (Douglas, J., concurring).

¶ 31     The Iowa Supreme Court also considered the United States Supreme Court's similar observations in *Meek* regarding the obvious religious purpose of parochial schools to propagate religious beliefs. *Community Lutheran School*, 326 N.W.2d at 290 (citing *Meek v. Pittenger*, 421 U.S. 349, 365-66 (1975), *overruled on other grounds by Mitchell v. Helms*, 530 U.S. 793, 808 (2000)). The nation's supreme court stated in relevant part (1) "church-related elementary and secondary schools *** are *** religion-pervasive institutions. The very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief" and (2) "it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many *** church-related *** schools." *Meek*, 421 U.S. at 365-66; see *Ursuline Academy, Inc. v. Director of the Division of Employment Security*, 420 N.E.2d 326, 327 (Mass. 1981) (finding that the primary function of a separately incorporated Catholic school was to run an elementary school with "a curriculum established in accordance with the tenets of the Roman Catholic Church" and had "embarked on a religious mission to inculcate Catholic youth with the tenets of the Roman Catholic Church … and is being operated primarily for religious purposes" (internal quotation marks omitted)); *Walz v. Tax Comm'n of the City of New York*, 397 U.S. 664, 671 (1970) (stating that the "affirmative if not dominant policy" of the instruction in precollege church schools is "to assure future adherents to a particular faith").

¶ 32     We add, according to the Supreme Court, it "has long recognized that religious schools pursue two goals, religious instruction and secular education." *Board of Education of Central School District No. 1 v. Allen*, 392 U.S. 236, 245 (1968).

¶ 33    After discussing these concepts, the Iowa court addressed the record. Testimony indicated that the three Lutheran schools had been started and were operating "to rear children in the Christian faith 'in all their schooling.' " *Community Lutheran School*, 326 N.W.2d at 291. The incorporation documents of at least one of the schools stated that the purpose of the school was "to provide students with a Christian education 'consistent with the tenets and beliefs of the Lutheran Church, Missouri Synod.' " *Community Lutheran School*, 326 N.W.2d at 291. One of the teachers testified that the school's purpose was to educate "in a permeating Christian atmosphere." *Community Lutheran School*, 326 N.W.2d at 291. Teachers were required to be Lutherans and hiring preference was given to teachers who had been educated at Missouri Synod colleges. *Community Lutheran School*, 326 N.W.2d at 291. Instruction about the Lutheran religion was part of the curriculum, but Lutheran principles were "incorporated into every aspect of all classes, and teachers work[ed] religion into all subjects." *Community Lutheran School*, 326 N.W.2d at 291. There were also what the court described as "religious ceremonies *** throughout the day." *Community Lutheran School*, 326 N.W.2d at 291.

¶ 34    This evidence and the precedent of other states interpreting statutory unemployment tax exemptions identical to the Iowa law led the Iowa court to conclude that the Lutheran schools were operating primarily for religious purposes. *Community Lutheran School*, 326 N.W.2d at 291-92.

¶ 35    There are many similarities between the Iowa Lutheran school program and the Chicago afterschool program at issue. The evidence indicates both were founded, staffed, and programmed to permeate the learning environment with specific religious ideals and instill that particular religious faith in the impressionable young students.

¶ 36    We also see many similarities between the Chicago program and the Nampa Christian Schools Foundation program that the Supreme Court of Idaho decided was operating primarily for religious purposes within the meaning of that state's unemployment compensation law. *Nampa Christian Schools Foundation, Inc. v. State*, 719 P.2d 1178 (Idaho 1986). The Idaho program had been organized by parents who wanted to provide a nondenominational " 'Christian' " education for high school students, and the school's articles of incorporation said the school came into being "to instruct in all subjects 'on the basis of the Biblical philosophy of creation, history and destination.' " *Nampa Christian Schools Foundation*, 719 P.2d at 1178-79. Corporation members had to be members in good standing of a local church or fellowship, believe in Jesus, "have a personal relationship with Him," and agree to the school's statement of faith. *Nampa Christian Schools Foundation*, 719 P.2d at 1179. The 22 teachers were also required to agree to the statement of faith, be "heavily involved in their local churches," and "agree to live and teach in harmony with 'fundamental Christianity.' " *Nampa Christian Schools Foundation*, 719 P.2d at 1179. The teachers had to integrate the statement of faith into their teaching, "view their employment 'as a work of faith,' " attend regular faculty prayer meetings, and incorporate the school's religious perspective into any secular texts. *Nampa Christian Schools Foundation*, 719 P.2d at 1179. They were even "evaluated on [their] ability to create a 'Christian' atmosphere" in the classroom. *Nampa Christian Schools Foundation*, 719 P.2d at 1179. Students were required to "agree to 'revere God and His established authority,' " comport with " 'Christian conduct,' " and attend weekly chapel services. *Nampa Christian Schools Foundation*, 719 P.2d at 1179. Students in the seventh grade and above had the additional obligation of engaging in Bible studies, and most of them signed the statement of faith. *Nampa Christian Schools Foundation*, 719 P.2d at 1179. The

Industrial Commission summed up " '[r]eligion pervades every aspect of the educational program of Nampa Christian Schools.' " *Nampa Christian Schools Foundation*, 719 P.2d at 1179. After further proceedings, the question of whether the school operated primarily for religious purposes within the meaning of Idaho unemployment insurance law came before the Idaho Supreme Court. *Nampa Christian Schools Foundation*, 719 P.2d at 1181. That court's analysis of the facts and the legal principles discussed above led it to conclude that "the school's intent and operations [showed] that it is a school with a religious mission and purpose" that qualified it for exemption from the unemployment compensation system. *Nampa Christian Schools Foundation*, 719 P.2d at 1183; see also *Begley v. Employment Security Comm'n of North Carolina*, 274 S.E.2d 370 (N.C. Ct. App. 1981) (holding that nonprofit elementary and secondary schools supervised by Catholic church hierarchy were operating primarily for religious purposes and exempt from North Carolina's unemployment insurance system); *Kendall v. Director of the Division of Employment Security*, 473 N.E.2d 196 (Mass. 1985) (in which Massachusetts supreme court affirmed exemption for nonprofit education and training center for intellectually disabled children and young adults that was owned and operated by order of Catholic nuns and supervised by bishop).

¶ 37    The principles and factual examples discussed above show that By The Hand qualifies for the statutory exemption at issue because it is operating primarily for religious purposes. By The Hand conveys the secular subjects of homework assistance and literacy improvement in a faith-based environment. The fundamentally religious nature of the afterschool program is evidenced by (1) the founder/executive director's goals of "sharing the gospel, praying, [and] teaching the bible every step of the way"; (2) governing documents that indicate the program aspires to "teach and model biblical truths"; (3) control of governing documents, key staff appointments, and assets by Moody Church's board of elders; (4) requirement that all staff consistently adhere to a religious doctrinal statement and regularly attend a local church; (5) pervasive Bible-based program content that includes evangelical study material, encouragement to memorize Bible verses, daily chapel services, broadcasting of Christian music on transportation to the afterschool program and field trips, and display of a Bible verse in every classroom; and (6) frequent prayers, such as at mealtime, chapel service, and in individual conversations. The record indicates that this afterschool program exists to teach children about an evangelical Christian religion and indoctrinate them into that faith. Or, as the founder and executive director of By The Hand put it, the purpose of By The Hand is to "get[ ] kids and families in [Moody] [C]hurch." Religion is why By The Hand exists. By The Hand is operating primarily for religious purposes within the meaning of Illinois unemployment compensation law.

¶ 38    The case that the Board's decision heavily relied upon, *St. Augustine's Center*, is easily distinguishable. *St. Augustine's Center*, 114 Ill. App. 3d 621. It concerned a Chicago center for American Indians founded in 1962 by an Episcopalian priest and governed by Episcopalians. *St. Augustine's Center*, 114 Ill. App. 3d at 622. The program occupied a three-story building with a chapel on the first floor. *St. Augustine's Center*, 114 Ill. App. 3d at 622. "Mass [was] offered in the chapel twice daily and on Sundays; confessions [were] heard at least once weekly and priests offer[ed] the full range of sacraments." *St. Augustine's Center*, 114 Ill. App. 3d at 622. According to its bylaws, however, the center was " 'established to provide counseling, casework and supportive services, and scholarship aid for American Indians, primarily those resident in Chicago.' " *St. Augustine's Center*, 114 Ill. App. 3d at 622. Evidence submitted to

- 12 -

IDES about the center's activities led the trial court to conclude that " '[e]ven without considering the charter and by-laws *** St. Augustine's is operated primarily for charitable purposes.' " *St. Augustine's Center*, 114 Ill. App. 3d at 625.

¶ 39    A program can have both "charitable" purposes and "religious" purposes. *St. Augustine's Center*, 114 Ill. App. 3d at 626. Nonetheless, the statutory exemption is for organizations and schools that "operate[ ] *primarily* for religious purposes." (Emphasis added.) 820 ILCS 405/211.3 (West 2016). Use of the word "primarily" indicates "of first importance" as opposed to "secondarily." (Internal quotation marks omitted.) *St. Augustine's Center*, 114 Ill. App. 3d at 626. Testimony indicated that " 'the main goal' " and actual " 'emphasis' " of the center's practices was " 'help[ing] out American Indian families who are coming to Chicago to achieve a better life *** morally, spiritually and physically.' " *St. Augustine's Center*, 114 Ill. App. 3d at 626. The Episcopalian priest who founded the center had "devoted his entire lifetime to the study and service of American Indians and [was] a noted author and historian specializing in the history of the Cheyenne." *St. Augustine's Center*, 114 Ill. App. 3d at 622 n.1. The center helped "approximately 2,500 American Indian families *** annually *** by means of monetary assistance, food, clothing, job training, counseling and other services." *St. Augustine's Center*, 114 Ill. App. 3d at 622.

¶ 40    The appellate court concluded that "religious services *** 'were only incidental to the Center's primary charitable function of providing secular assistance and benefits to American Indians' " who were acclimating to Chicago. *St. Augustine's Center*, 114 Ill. App. 3d at 625. The primary purpose was to offer social services, and the religious attributes were only a secondary purpose. *St. Augustine's Center*, 114 Ill. App. 3d at 626. The center did not qualify for the exemption at issue. *St. Augustine's Center*, 114 Ill. App. 3d at 627.

¶ 41    By The Hand differs significantly from the St. Augustine's Center program, as there is no indication that staff at the American Indian center had to be Episcopalian, annually certify their adherence to the standards of an Episcopalian Bible, or regularly attend a local Episcopalian church. There was no expectation that the staff would be Christian role models or conduits into the Episcopalian faith. Nor is there an indication that anyone at the American Indian center preached to the community members, mandated daily chapel attendance, coached the memorization of Bible passages, or played Christian music on the premises. The center was created to provide resources such as money, food, and job training that would ease the transition into residing in Chicago. Another distinction is that the center did not track Episcopalian church attendance or gauge the success of the program on how many of the recipients identified as Episcopalian. The religious aspects of the social services center, such as chapel attendance, were secondary and avoidable, unlike the religious aspects of the afterschool program here that has the admitted and obvious purpose to spread the influence of evangelical faith and Moody Church.

¶ 42    IDES also misinterprets the significance of two cases regarding nonprofit cemeteries that were separately incorporated from the Lutheran associations that founded them. The corporations were simply in the business of owning and operating the cemeteries, which is a secular activity, not a religious activity. Concordia's bylaws and articles of incorporation indicated that it was set up in the late 1800s by a group of Lutheran churches to acquire and receive property and operate and maintain a cemetery in Chicago. *Concordia Ass'n v. Ward*, 177 Ill. App. 3d 438, 439, 532 N.E.2d 411, 412 (1988). Concordia's income was from selling lots, caskets, flowers, and charging lot owners for the services of watering, grass cutting, and

planting. *Concordia*, 177 Ill. App. 3d at 440. Only members of the Lutheran faith or their family members could be buried at Concordia. *Concordia*, 177 Ill. App. 3d at 439-40. But Concordia neither offered nor performed any religious services, and family members of the deceased were required to arrange for any religious services on their own. *Concordia*, 177 Ill. App. 3d at 440. Concordia's functions were "no different than those performed in a secular cemetery." *Concordia*, 177 Ill. App. 3d at 442. The court found that Concordia's primary purpose was to provide a burial place for the dead, "[b]urial of the dead is a matter of public concern," and any historical religious purposes were secondary. *Concordia*, 177 Ill. App. 3d at 442. Concordia was not exempt from employer contributions into the unemployment insurance system. *Concordia*, 177 Ill. App. 3d at 442. Bethania had a similar origin, in that it was incorporated to acquire property for use as a cemetery. *Bethania*, 262 Ill. App. 3d at 774. Bethania also had a similar operation and its income was from selling lots, flowers, and monuments and charging for opening and closing graves. *Bethania*, 262 Ill. App. 3d at 775. Bethania did not require that persons buried there have any particular religious identity. *Bethania*, 262 Ill. App. 3d at 775. It too was found to be performing primarily secular functions in burying the dead. *Bethania*, 262 Ill. App. 3d at 780. Bethania was not exempt. *Bethania*, 262 Ill. App. 3d at 780. Neither of these secular operations resembles what By The Hand does, and neither case has any relevance here.

¶ 43    We are also unpersuaded by several property tax exemption cases that the Board cited in its decision, including *Faith Builders*, 378 Ill. App. 3d 1037; *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 925 N.E.2d 1131 (2010); and *Franciscan Communities, Inc. v. Hamer*, 2012 IL App (2d) 110431, 975 N.E.2d 733. For purposes of the tax exemption of real property used for religious purposes at issue there, these courts considered two steps. They first looked at whether advancing religion was identified as the property's dominant purpose and then examined whether the operation was more businesslike and characteristic of a commercial enterprise than a facility used primarily for religious purposes. *Faith Builders*, 378 Ill. App. 3d at 1044-45; *Provena Covenant Medical Center*, 236 Ill. 2d at 408-09; *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 29. We note that the property tax exemption statute has since changed and that courts no longer engage in this analysis. In any event, the unemployment tax exemption cases that we applied above are controlling rather than any case about property tax exemption.

¶ 44    Moreover, the Board failed to appreciate the significant factual differences between these property use cases and By The Hand's afterschool program. In *Faith Builders*, the property owner characterized itself as a school that incorporated " 'God's Word [into] the curriculum.' " *Faith Builders*, 378 Ill. App. 3d at 1039. It was granted a property tax exemption for the portion of its building used for parochial kindergarten and older grade levels, but it was denied the exemption for the space that was used for childcare.

¶ 45    The childcare space failed the first prong of the two prongs of a religious use property tax exemption because its own stated purpose was not a religious purpose. The handbook issued to parents stated that "*much* of the infant[']s and toddler[']s learning and play is self-directed and [self-]motivated." (Emphasis added and internal quotation marks omitted.) *Faith Builders*, 378 Ill. App. 3d at 1040. Thus, the organization's own description of what the "school" could provide to such young children—infants, toddlers, and preschoolers—was not schooling. The parents' handbook indicated that religious activities were secondary at best, listing 11 needs that the staff attended to, including, " '[assistance with] learning to sit, crawl, roll, walk, and

other movement activities' " and the staff's attention to " 'the physical needs and hygiene of the children.' " *Faith Builders*, 378 Ill. App. 3d at 1040. Further down the organization's stated purposes was just one religious activity, incorporating " '[s]imple Bible and children stories, games, fingerplays, music, songs, movements, and sounds *** into the daily routine.' " *Faith Builders*, 378 Ill. App. 3d at 1040. There was testimony that staff members were reading Bible verses to infants as young as six weeks old. *Faith Builders*, 378 Ill. App. 3d at 1039. The administrative law judge concluded that the program had " 'religious overtones,' " but the property was primarily used for daycare and did not qualify for the religious purposes exemption. *Faith Builders*, 378 Ill. App. 3d at 1040. The appellate court affirmed, reasoning in part:

> "Infants, toddlers, and preschoolers have an extremely limited capacity for assimilating theological concepts. With children so young, the supervising adults' primary purpose, from 6 a.m. to 6 p.m., will inevitably be day care—and Faith Builders' descriptive literature reflects that reality. In a list of 11 tasks and activities, religion appears once. Arguably, that is because the children are simply too young for sustained religious instruction and their primary need is day care." *Faith Builders*, 378 Ill. App. 3d at 1045.

¶ 46   The court indicated that it need not reach the second prong, whether the program was operating with a view toward profit, but the record indicated the center functioned in a businesslike manner, like a commercial daycare, rather than like a facility used primarily for religious purposes:

> "Parents must pay weekly tuition to 'reserve a space' for the child, and Faith Builders does not seem to care whether the child is in attendance as long as the tuition is paid. Faith Builders charges late fees and turns away the children of nonpaying parents ('you will be asked to withdraw your child from the center'). We do not question the economic or practical necessity of these measures, but they suggest a business relationship more than a religious one." *Faith Builders*, 378 Ill. App. 3d at 1046.

¶ 47   We contrast these circumstances with By The Hand's founding purpose, the actual activities it undertakes with school-aged children and their teachers and parents, and its source of funding. The advancement of religion is unquestionably the stated primary purpose of the afterschool program; religion pervades every aspect of the program, and income from various donors enables By The Hand to operate entirely free-of-charge to the children rather than as a commercial enterprise with an eye toward profit. The Board's reliance on a property tax case that is readily distinguishable was unsound.

¶ 48   Similarly, *Provena Covenant Medical Center* concerned a hospital that served a 13-county area in east central Illinois, offered the full range of healthcare services, including a 24-hour emergency department, intensive care center, cancer treatment, and behavioral health care, and it charged for those services. *Provena Covenant Medical Center*, 236 Ill. 2d at 375. Understandably, it did not qualify for the religious use property exemption. *Provena Covenant Medical Center*, 236 Ill. 2d at 410. There is no similarity between this extensive commercial healthcare enterprise and a small afterschool program that provides free-of-charge homework assistance and literacy training to disadvantaged children and also feeds them while they are onsite.

¶ 49   The other property tax exemption case the Board cited concerned a continuing care retirement community that charged substantial entry fees and monthly fees to seniors to reside in a variety of independent living apartments, assisted living units, and a skilled nursing care

- 15 -

center. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶¶ 5-6. There were also organized activities, a country store, and a beauty salon on the premises. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 5. The community was marketed as a place for healthy, active seniors to initially live independently but then remain on site and receive care in the other tiers as their health declined. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 5. Depending on the selected style and square footage of the apartment, the entrance fees in 2007 ranged from a low of $244,186 with a monthly service fee of $1248, to a high of $332,608 with a monthly service fee of $1771. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 6. Residency could be terminated if a senior failed to timely pay their monthly fee or declared bankruptcy. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 7. In 2007, the property's gross revenue was $17.4 million, and its net revenue was $15.6 million. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 7. The property was owned by an order of Catholic nuns who were devoted to serving the elderly. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 9. However, none of the sisters lived on site, none of the employees were required to be Catholic, and none of the residents were required to be Catholic. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 9. Religious symbols were displayed in the public spaces but were not required in the personal living spaces. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 9. Hymn singing, Bible studies, and the Rosary were offered in various areas, but only the onsite chapel was reserved exclusively for religious reflection and worship. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 9. Marketing materials indicated there was a religious component to the community, but the primary use of the property was not to advance religion. *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 35. The primary use was a commercial use to provide "upscale senior housing and care with an enhanced lifestyle." *Franciscan Communities*, 2012 IL App (2d) 110431, ¶ 35. There are no similarities between the Catholic nuns' commercial enterprise and By The Hand's free-of-charge program. This case does not support the Board's determination that the afterschool program was secular.

¶ 50 We also disagree with the Board's reference to the statement in *Faith Builders* that "[a] church could open a restaurant, for instance, and because waiters attempted to evangelize customers while taking their orders, the restaurant would [wrongly claim to] be exempt." *Faith Builders*, 378 Ill. App. 3d at 1046. The case is distinguishable not only because it involved a different statute but also because By The Hand does not run a commercial enterprise such as a restaurant or a for-profit tutoring service.

¶ 51 Here, the undisputed record shows that By The Hand considers it an act of Christian faith to care for the whole child, "mind, body, and soul." According to By The Hand, the activities of feeding hungry children, helping struggling readers, and occasionally caring for children's medical needs are no less religious activities than leading Bible studies, chapel services, scripture memorization, and prayers. Every aspect of the afterschool program was intended to be "a way of loving kids as Jesus would" because "[w]hen Jesus walked on the Earth, he met physical needs, and spiritual needs." As stated by one court, "the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions." *Western Presbyterian Church v. Board of Zoning Adjustment of District of Columbia*, 862 F. Supp. 538, 544 (D.D.C. 1994).

> "For example, one of the five Pillars of Islam—the fundamental ritual requirements of worship, including ritual prayer—requires Muslims of sufficient means to give alms to the poor and other classes of recipients. [Citation.] Also, Hindus belonging to the

- 16 -

Brahmin, Ksatriya, and Vaisya castes are required to fulfill five daily obligations of worship, one of which is making offerings to guests, symbolized by giving food to a priest or giving food or aid to the poor. [Citation.] The concept finds its place in Judaism in the form of tendering to the poor clothing for the naked, food for the hungry, and benevolence to the needy." *Western Presbyterian Church*, 862 F. Supp. at 544.

¶ 52　The line between secular activities and religious activities is "hardly a bright one." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336 (1987). Because By The Hand characterized its provision of meals, homework help, and literacy improvement as religious exercises, IDES erred by recharacterizing them as secular activities for purposes of the exemption from the unemployment compensation system.

¶ 53　The Board relied on cases that are easily distinguishable, and it failed to appreciate the relevance of the most factually analogous Illinois unemployment insurance case, *Unity Christian School*. *Unity Christian School*, 2014 IL App (3d) 120799. From this thin analysis, it came to the unwarranted conclusion that By The Hand operates a secular program like the St. Augustine's Center.

¶ 54　The record developed before IDES demonstrates that By The Hand operates primarily for religious purposes. The fact that By The Hand uses the medium of literacy improvement coaching, homework assistance, dinner, and, on an *ad hoc* basis, occasionally assists with dental and vision care in order to bring children under its religious influence does not defeat its primarily religious purpose. The Board's decision to the contrary is clearly erroneous. Based upon the law and record, we are left with a firm and definite conviction that a mistake has been made. Wimberly was not eligible for unemployment benefits by virtue of the exemption stated in section 211.3(A)(2) of the Act. 820 ILCS 405/211.3(A)(2) (West 2016).

¶ 55　Because of our conclusion that the Board's decision was clearly erroneous, we need not reach the parties' constitutional arguments. *Turcol v. Pension Board of Trustees of the Matteson Police Pension Fund*, 214 Ill. 2d 521, 524, 828 N.E.2d 277, 278 (2005) (courts reach constitutional arguments only when necessary to decide the case).

¶ 56　The circuit court's decision to reverse the Board was correct. We affirm the decision of the circuit court and reverse the decision of the board.

¶ 57　Circuit court affirmed; Board decision reversed.

¶ 58　JUSTICE COBBS, dissenting:

¶ 59　By The Hand, an afterschool program, seeks to meet the academic, spiritual, and health needs of Chicago youth who demonstrate literacy concerns. The Board determined that the program's operations are not "primarily for religious purposes" and thus denied it an exemption pursuant to section 211.3(A)(2) of the Act. The majority disagrees and, citing to the program's various religious activities, holds that the Board's findings are clearly erroneous. I disagree with the majority and must, therefore, respectfully dissent.

¶ 60　At the outset, I would acknowledge that this case, which involves an interpretation of the seemingly simple statutory phrase, "primarily for religious purposes," lends itself to a fair measure of debate. However, even a cursory review of the record before us reveals as many

facts that demonstrate By The Hand's secular purpose as they do its religious one. Therein lies the problem, but also in my view, the solution.

¶ 61　　The Act requires all employers to make contributions to a fund that is used to provide money to involuntarily unemployed workers to assist in the financial hardships caused by unemployment. This Act is not a taxing act but is legislation to relieve the burdens of unemployment through the state's police powers. *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61, 73 (1991) (and cases cited therein). Because the legislature passed the Act with public welfare in mind, our construction of the Act's provisions "should favor inclusion" rather than exemption, and subsequently, the entity seeking an exemption bears a strict burden of proof. *Id.* at 75.

¶ 62　　This strict baseline standard for establishing entitlement to an exemption is met here with a standard of review of clearly erroneous. This standard is " 'significantly deferential' " to the agency's decision. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 393 (quoting *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 623 (1993)). The level of deference is not without basis. Deference is accorded because of the agency's expertise and experience. *Id.* at 394-95. I agree with the majority that the standard of review does not require us to "blindly defer" to the agency's decision. Our supreme court has made that abundantly clear. See *id.* at 394. However, neither does the standard permit substitution of our judgment for that of the Board's.

¶ 63　　In its consideration of the evidence, the Board found that the primary purpose of By The Hand was not religious. In so finding, the Board stated that "[w]hile Chapel/bible studies are mandatory and evangelism occurs throughout all activities, the rest of the daily program is nonreligious in nature." Specifically, the Board found that the actual functions of By The Hand were "meals, homework help, vocabulary building, and reading-improvement guidance," which it held were "not changed by the evangelism incorporated into these activities."

¶ 64　　Without question, By The Hand provides multiple opportunities for the children to learn more about the Christian faith and requires them to spend a portion of each day at chapel or engaging in some other religious activity. These activities, however, are not to exclusion of the program's academic or secular component. Indeed, the record reflects that 30 minutes of the afterschool program is devoted to bible reading and/or time in chapel. One hour of the day is spent for meals, which may, but I note need not, provide opportunities for prayer and conversations. The remaining time is split between "three academic rotations," which includes rotations for homework, the Lexia reading program, and read aloud. I note that the majority describes the read aloud rotation as, "the children and staff will read and discuss material from the Bible or similar source," whereas Heth, the director of human resources and volunteer development, stated that the reading material would be either a book, a Bible study, or an article, concluding that the material varies based on the staff's selection.

¶ 65　　It is clear that Christian ideals are promoted throughout the program. It is equally clear that a good many of the program's activities are secular in nature and are specifically geared towards education assistance with a focus on literacy. However, it is not necessary for By The Hand to operate an afterschool program focused on reading proficiency to achieve its religious purposes. The very genesis for the afterschool program was to provide tutoring for those children believed to be deficient in reading skills, not religious training. By The Hand's recruitment effort offers tutoring to a targeted population of students deficient in reading skills,

with information provided to its potential participants that religious training is a component of the program. Not the other way around.

The Moody Church embraced the afterschool program idea and, indeed, continues to provide some financial support and governance oversight for By The Hand, factors which I believe go to the control factor of section 211.3(A)(2). And although "organized" is not a factor under the current Act, it should not escape anyone's notice that the program's articles of incorporation state that the program is organized "exclusively for religious and charitable purposes"—both, not primarily either. Those terms—"charitable" and "religious"—are not mutually exclusive. " '[T]he mere fact that an organization is charitable does not necessarily mean that it is religious, but, conversely, the fact that an organization is charitable does not preclude it from being religious.' " *St. Augustine's Center*, 114 Ill. App. 3d at 626 (quoting *St.Vincent DePaul Shop v. Garnes*, Unempl. Ins. Rep. (CCH) ¶ 8914, at 38,676 (Ohio Ct. App. Sept. 17, 1974)).

I have no quarrel with the assertion that By The Hand was founded on Christian beliefs, neither have I any doubt regarding the sincerity of its evangelism. To achieve spiritual growth, By The Hand offers religious activities. To achieve academic growth, By The Hand offers homework assistance and reading development. The fact that the program's various religious and secular activities might on occasion intersect or overlap has no transformative effect on the program's purpose or, in my view, its purposes. For instance, the program's purpose of improving literacy remains unaltered even if the use of stories from the Bible aid in that process. In fact, both the religious and charitable purposes of the program are served, with the reading activity serving as the conduit for the religious activity. However, neither activity, merely by virtue of their connectivity, can be elevated to the position of primary, as both serve to satisfy more than one of the program's goals.

By The Hand operates on an annual budget of nearly $8 million. A portion of that funding comes from the Moody Church. However, the Moody Church is not By The Hand's sole benefactor. By The Hands' annual budget is comprised of contributions from individuals, as well as from other "institutional donors and foundations." No doubt, in seeking contributions, By The Hand showcases the full panoply of its activities, as it ought. They are substantial. However, we cannot overlook evidence in the record that those contributions are in response to By The Hand's solicitations in which it indicates to potential donors that the program improves literacy skills. Specifically, Kole, the director of finance, stated that in soliciting donations, donors are informed of "the impacts *** that the program's having on the neighborhoods, *** on the children, on the families, on the kids that are in college" along with the "graduation rates, the reading rates, [and] literacy improvements." Notably, $200,000 of the program's annual funding for meals is provided by Chicago Public Schools (CPS) through a "reimbursement grant." I would further note from the record that CPS teachers sometimes recommend particular children for participation in the program. Accepting By The Hand's characterization of the program as "primarily for religious purposes" means that CPS's student referrals and its investment of public funds support a program whose primary purpose is to win souls.

The dissent in *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 52 (Lytton, J., dissenting) (quoting *People ex rel. Hartigan v. Dynasty System Corp.*, 128 Ill. App. 3d 874, 882 (1984)), pointed out that " 'primarily' " means " 'pre-eminently' " or " 'fundamentally.' " Mindful of the strict burden of proof and the somewhat deferential standard of review, I am

not convinced, even by the majority's recitation of the facts, that By The Hand is fundamentally or preeminently operated for religious purposes or that the Board's decision was clearly erroneous. Because there is ample evidence in the record to support a finding that By The Hand's primary purpose was not religious, the majority's conclusion is arguable at best. Nevertheless, the question is not whether the evidence could have been construed differently but whether the Board's decision was clearly erroneous. *E-Z Movers, Inc. v. Rockwell*, 2016 IL App (1st) 150435, ¶ 42.

¶ 70    Moreover, "debatable questions are resolved in favor of taxation." *Unity Christian School*, 2014 IL App (3d) 120799, ¶ 40. What is this question before us if not a debatable one? For that reason, I must conclude that By The Hand is not exempt, and I cannot find that the Board's decision was clearly erroneous. To so find would not render our decision one in which we "blindly defer" to the Board. It would instead acknowledge that By The Hand offers diverse activities, all of which serve to build the body, mind, and soul but not all of which are religious. And, as important, such a decision would affirm that the Board's decision was a reasonable one, that it is supported by the record, and that it takes into consideration the legislative intent and policy goals behind the Act.

¶ 71    By The Hand offers some activities that are clearly religious—bible study, scripture lessons, and prayer, which is consistent with its bylaws. It also offers some activities that are clearly charitable—access to health care, meals, and academic training, which is also consistent with its bylaws. The program provides resources and tracks, not only the students' spiritual development, but also their academic achievement. The program's charitable activities, although rooted in Christian values, are not themselves religious activities.

¶ 72    Finally, I would note that By The Hand could effectively operate as a year-round vacation bible school and then unequivocally qualify for the exemption it seeks here. However, the program was separately incorporated from the Moody Church and its organizers created a literacy program for children. That decision rested entirely with the program's organizers and appropriately so. However, it is difficult to reconcile those facts with By The Hand's stance that religion is its fundamental or preeminent purpose. Given the diversity of By The Hand's activities, I do not believe that the Board's finding was clearly erroneous. Thus, unlike the majority, I am not left with a "definite and firm conviction" that the Board's decision was a mistake, and I would affirm the Board's decision finding that By The Hand did not establish its right to the exemption under the Act.